UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| RAYMOND BENITEZ,<br>individually and on behalf of all others similarly situated,<br><br>     *Plaintiff,*<br><br>v.<br><br>THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY, d/b/a CAROLINAS HEALTHCARE SYSTEM, ATRIUM HEALTH,<br><br>     *Defendant.* | Case No.<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Raymond Benitez, individually, and on behalf of all others similarly situated, for his complaint against Defendant Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System, Atrium Health ("CHS"), states as follows:

## NATURE OF THE ACTION

1. This is an action for restraint of trade seeking classwide damages and injunctive relief under Section One of the Sherman Act and Sections 4 and 16 of the Clayton Act.

2. This matter arises from CHS's abuse of its market dominance through the imposition of unlawful contract restrictions that prohibit commercial health insurers from offering inpatients financial benefits to use less-expensive health care services offered by CHS's competitors. This unlawful restraint of trade is the subject of a separate injunctive action by the United States of America and the State of North Carolina. This related action seeks a remedy for consumers who, as a result of CHS's unlawful conduct, have been forced to pay CHS above-

competitive prices for inpatient services through co-insurance payments and other direct payments.

## THE PARTIES

3. Plaintiff Raymond Benitez resides in Charlotte, North Carolina in Mecklenburg County. Between July 4, 2016 and July 10, 2016 he utilized CHS general acute care inpatient hospital services for seven overnight stays. He was insured by Blue Cross Blue Shield of North Carolina and under his policy made a co-insurance payment directly to CHS of $3,440.36.

4. CHS is a North Carolina not-for-profit corporation providing healthcare services with its principal place of business in Charlotte. Its flagship facility is Carolinas Medical Center, a large general acute-care hospital located in downtown Charlotte. It also operates nine other general acute-care hospitals in the Charlotte area. It has done business until recently as Carolinas HealthCare System and now does business as Atrium Health.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

5. The Court has subject-matter jurisdiction over this action under Section 4 of the Clayton Act, 15 U.S.C. § 15; and Section 16 of the Clayton Act, 15 U.S.C. § 26; and 28 U.S.C. §§ 1331, 1337(a), and 1345.

6. The Court has personal jurisdiction over CHS under Section 12 of the Clayton Act, 15 U.S.C. § 22. CHS maintains its principal place of business and transacts business in this District.

7. Venue is proper under 28 U.S.C. § 1391 and Section 1 of the Clayton Act, 15 U.S.C. § 22. CHS transacts business and resides in this District, and the events giving rise to the claims occurred in this District.

8. CHS engages in interstate commerce and in activities substantially affecting interstate commerce. CHS provides healthcare services for which employers, insurers, and individual patients remit payments across state lines. CHS also purchases supplies and equipment that are shipped across state lines, and it otherwise participates in interstate commerce.

## FACTUAL ALLEGATIONS

### I. Background

9. CHS is the second largest public health system in the United States. It has what CHS calls 12 million patient "encounters" each year, or "one every three seconds" in the Charlotte area. Many of these involve hospital admissions. More than 50% of all Charlotte inpatient revenues are paid to CHS. Its largest competitor has less than half of CHS's revenues.

10. As this Court has pointed out, the complex world of healthcare is perplexing for consumers and "… [these complexities] present difficulties, frequently to consumers who become limited by who can provide their healthcare and how much it will cost." The free market is the greatest force for efficient, cost-based pricing, and innovation in human history. Just as democracy can thrive only in a free political system unhindered by outside forces, market efficiency and capitalism can survive only if market power is kept in check. Thus, it is imperative to ensure full and fair competition in healthcare markets. Only this keeps the healthcare pricing facing insurance and inpatient consumers at competitive levels and preserves competitive choice. This is the goal of both public and private enforcement of the antitrust laws.

11. CHS's market power has enabled it to negotiate high prices (in the form of high "reimbursement rates") for treating insured patients. CHS has long had a reputation for being a high-priced healthcare provider. In a 2013 presentation, CHS's internal strategy group recognized that CHS "has enjoyed years of annual reimbursement rate increases that are

3

premium to the market, with those increases being applied to rates that are also premium to the market."

12. Steering is a method by which insurers offer consumers of healthcare services options to reduce some of their healthcare expenses. Steering typically occurs when an insurer offers consumers a financial incentive to use a lower-cost provider or lower-cost provider network, in order to lower their healthcare expenses.

13. Steering – and the competition from lower-priced healthcare providers that steering animates – threatens CHS's high prices and revenues. In 2013, CHS's internal strategy group surveyed a dozen of CHS's senior leaders, asking them to list the "biggest risks to CHS revenue streams." Nine of the twelve leaders polled identified the steering of patients away from CHS as one of the biggest risks to CHS's revenues.

14. To protect itself against steering that would induce price competition and potentially require CHS to lower its high prices, CHS has imposed steering restrictions in its contracts with insurers. These restrictions impede insurers from providing financial incentives to patients to encourage them to consider utilizing lower-cost but comparable or higher quality alternative healthcare providers.

15. The United States of America and the State of North Carolina seek to enjoin CHS from using unlawful contract steering restrictions that prohibit commercial health insurers in the Charlotte area from offering inpatients financial benefits to use less-expensive healthcare services offered by CHS's competitors. These steering restrictions reduce competition resulting in pricing injury to Charlotte area consumers. This related action seeks remedy for the overcharge damages of inpatients paying CHS directly for inpatient services through co-insurance payments or otherwise.

16. Section 5 of the Clayton Act, 15 U.S.C. § 16(a), accords preclusive or prima facie effect in a private damage action to civil and criminal judgments obtained by the United States Department of Justice. This encourages private damage actions relying, in part, on government prosecutions. Thus, public enforcement by the United States Department of Justice, which typically pursues only the most flagrant violations of the antitrust laws, is supplemented by private enforcement enlarging penalties for such violations and deterring future misconduct.

17. Plaintiff relies, in part, on the United States' and the State of North Carolina's thorough assessments of the CHS restraint of trade and their conclusions as to what constitutes the public interest. Plaintiff does not seek consolidation with the government action. However, Plaintiff is prepared to proceed with coordination of discovery should the Court deem that appropriate.

## II. Relevant Market

18. The sale of general acute care inpatient hospital services to insurers ("acute inpatient hospital services") is a relevant product market. The market includes sales of such services to insurers' individual, group, fully-insured, and self-funded health plans, as well as to inpatients directly compensating CHS through coinsurance or otherwise.

19. The relevant market does not include sales of acute inpatient hospital services to government payers, e.g., Medicare (covering the elderly and disabled), Medicaid (covering low-income persons), and TRICARE (covering military personnel and families) because a healthcare provider's negotiations with an insurer are separate from the process used to determine the rates paid by government payers.

20. Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital. Although individual acute inpatient hospital services are not substitutes for each other (e.g., obstetrics is

5

Case 3:18-cv-00095-RJC-DCK   Document 1   Filed 02/28/18   Page 5 of 16

not a substitute for cardiac services), insurers typically contract for the various individual acute inpatient hospital services as a bundle, and CHS's steering restrictions have an adverse impact on the sale of all acute inpatient hospital services. Therefore, acute inpatient hospital services can be aggregated for analytical convenience.

21. There are no reasonable substitutes or alternatives to acute inpatient hospital services. Consequently, a hypothetical monopolist of acute inpatient hospital services would likely profitably impose a small but significant price increase for those services over a sustained period of time.

22. The relevant geographic market is no larger than the Charlotte area. In this Complaint, the Charlotte area means the Charlotte Combined Statistical Area, as defined by the U.S. Office of Management and Budget, which consists of Cabarrus, Cleveland, Gaston, Iredell, Lincoln, Mecklenburg, Rowan, Stanly, and Union counties in North Carolina, and Chester, Lancaster, and York counties in South Carolina. The Charlotte area has a population of about 2.6 million people.

23. Insurers contract to purchase acute inpatient hospital services from hospitals within the geographic area where their enrollees are likely to seek medical care. Such hospitals are typically close to their enrollees' homes or workplaces. Insurers who seek to sell insurance plans to individuals and employers in the Charlotte area must include Charlotte area hospitals in their provider networks because people who live and work in the Charlotte area strongly prefer to obtain acute inpatient hospital services in the Charlotte area. Charlotte area consumers have little or no willingness to enroll in an insurance plan that provides no network access to hospitals located in the Charlotte area.

6
Case 3:18-cv-00095-RJC-DCK   Document 1   Filed 02/28/18   Page 6 of 16

24. For these reasons, it is not a viable alternative for insurers that sell health insurance plans to consumers in the Charlotte area to purchase acute inpatient hospital services from providers outside the Charlotte area. Consequently, competition from providers of acute inpatient hospital services located outside the Charlotte area would not likely be sufficient to prevent a hypothetical monopolist provider of acute inpatient hospital services located in the Charlotte area from profitably imposing small but significant price increases for those services over a sustained period of time.

### III. Market Power

25. CHS – with more than 50% of all Charlotte inpatient revenues – exerts market power in its dealings with commercial health insurers ("insurers"). CHS's market power results from its large size, the comprehensive range of healthcare services that it offers, its high market share, and insurers' need to include access to CHS's hospitals – as well as its other facilities and providers – in at least some of their provider networks in insurance plans that cover people in the Charlotte area. CHS's market power is further evidenced by its ability to profitably charge prices to insurers and inpatients that are higher than competitive levels across a range of services, and to impose on insurers restrictions that reduce competition.

26. CHS's maintenance and enforcement of its steering restrictions lessen competition between CHS and the other providers of acute inpatient hospital services in the Charlotte area that would, in the absence of the restrictions, likely reduce the prices paid for such services by insurers and their inpatient enrollees. Thus, the restrictions help to insulate CHS from competition, by limiting the ability of CHS's competitors to win more commercially-insured business by offering lower prices.

27. Insurers want to steer inpatient enrollees towards lower-cost providers and to offer innovative insurance plans that steer. For years, insurers have tried to negotiate the removal

of steering restrictions from their contracts with CHS, but cannot because of CHS's market power. In the absence of the steering restrictions, insurers would likely steer consumers to lower-cost providers more than their current contracts with CHS presently permit.

## IV. Anti-Steering Conduct Restraining Trade

28. CHS restricts steering to help insulate itself from price competition, which enables CHS to maintain high prices to insurers and inpatients and preserve its dominant position, and not for any procompetitive purpose. Indeed, when asked under oath whether CHS should limit the ability of insurers to offer tiered networks or narrow networks that exclude CHS, Carol Lovin, CHS's Chief Strategy Officer, said that CHS should not. And when asked her view about the possibility of eliminating CHS's steering restrictions, she testified, "Would I personally be okay with getting rid of them? Yes, I would." CHS's steering restrictions do not have any procompetitive effects. CHS can seek to avoid losses of revenues and market share from lower cost competitors by competing to offer lower prices and better value than its competitors, rather than imposing rules on insurers that reduce the benefit to its rivals from competing on price.

29. Tiered networks are a popular type of steering that insurers use in healthcare markets. Typically, insurers using tiered networks place healthcare providers that offer better value healthcare services (lower cost, higher quality) in top tiers. Patients who use top-tier providers pay lower out-of-pocket costs. For example, for a procedure costing $10,000, a patient might be responsible for paying $3,600 in co-insurance at a lower-tier hospital, but only $1,800 co-insurance to have the same procedure performed at a top-tier hospital.

30. Narrow-network insurance plans are another popular steering tool. Typically, narrow networks consist of a subset of all the healthcare providers that participate in an insurer's conventional network. A consumer who chooses a narrow-network insurance plan typically pays lower premiums and lower out-of-pocket expenses than a conventional broad-network insurance

8

Case 3:18-cv-00095-RJC-DCK   Document 1   Filed 02/28/18   Page 8 of 16

plan as long as the consumer is willing to choose from the smaller network of providers for his or her healthcare needs.

31. Providers are motivated to have insurers steer towards them, including through an insurer's narrow or tiered network, because of the increased patient volume that accompanies steering. Thus, the ability of insurers to steer gives providers a powerful incentive to be as efficient as possible, maintain low prices, and offer high quality and innovative services. By doing so, providers induce insurers to steer patient volume to them. Individuals and employers that provide health insurance to their employees benefit tremendously from this because they can lower their healthcare expenses.

32. CHS has gained patient volume from insurers steering towards CHS, and has obtained higher revenues as a result. CHS encourages insurers to steer patients toward itself by offering health insurers modest concessions on its market-power driven, premium prices.

33. However, CHS forbids insurers from allowing CHS's competitors to do the same. CHS prevents insurers from offering tiered networks that feature hospitals that compete with CHS in the top tiers, and prevents insurers from offering narrow networks that include only CHS's competitors. By restricting its competitors from competing for – and benefitting from – steered arrangements, CHS uses its market power to impede insurers from negotiating lower prices with its competitors and offering lower-premium plans.

34. CHS also imposes restrictions in its contracts with insurers that impede insurers from providing truthful information to consumers about the value (cost and quality) of CHS's healthcare services compared to CHS's competitors. CHS's restrictions on insurers' price and quality transparency are an indirect restriction on steering because they prevent inpatients from

9

accessing information that would allow them to make healthcare choices based on available price and quality information.

35. Because CHS's steering restrictions prevent its competitors from attracting more inpatients through lower prices, CHS's competitors have less incentive to remain lower priced and to continue to become more efficient. As a result, CHS's restrictions reduce the competition that CHS faces in the marketplace. In the instances in which insurers have steered in other markets and in the few instances in which insurers have steered in the Charlotte area despite CHS's restrictions, insurers have reduced health insurance costs for consumers.

36. Four insurers provide coverage to more than 85 percent of the commercially-insured residents of the Charlotte area. They are: Aetna Health of the Carolinas, Inc., Blue Cross Blue Shield of North Carolina, Cigna Healthcare of North Carolina, Inc., and United Healthcare of North Carolina, Inc.

37. CHS maintains and enforces steering restrictions in its contracts with all four of these insurers. In some instances, the contract language prohibits steering outright. For example, CHS secured a contractual obligation from one insurer that it "shall not directly or indirectly steer business away from" CHS. In other instances, the contract language gives CHS the right to terminate its agreement with the insurer if the insurer engages in steering, providing CHS the ability to deny the insurer and its enrollees access to its dominant hospital system unless the steering ends. Although the contractual language that CHS has imposed varies with each insurer, it consistently creates disincentives that deter insurers from providing to their enrollees truthful information about their healthcare options and the benefits of price and quality competition among healthcare providers that the insurers could offer if they had full freedom to steer.

## V. Antitrust Injury

38. As a result of this reduced competition due to CHS's steering restrictions, inpatients and employers in the Charlotte area pay higher prices for health insurance coverage, have fewer insurance plans from which to choose, and are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely.

39. Insurance companies are not the sole source of non-government reimbursement inpatient revenues to CHS. CHS also receives payments directly from Charlotte area inpatient consumers in the form of "co-insurance" payments and other direct payments for expenses not covered by insurance. A co-insurance payment is the percentage of the bill for inpatient medical services paid directly by the insured inpatient consumer, with the rest paid by the insurance company.

40. As a direct result of CHS's anti-competitive conduct, inpatient consumers are forced to pay above-competitive prices for co-insurance and other direct payments to CHS.

## CLASS ALLEGATIONS

### A. Fed. R. Civ. P. 23(a) Prerequisites

41. Plaintiff ("Class Representative") is a representative of persons residing in the Charlotte Combined Statistical Area making direct payments for general acute care inpatient procedures to the Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System and Atrium Health ("CHS") on or after February 28, 2014. Such persons include inpatients making direct co-insurance payments to CHS as a result of their health plan deductibles or otherwise; or, if no health insurance covers a procedure, direct payments to CHS for all or part of the procedure's costs. Excluded from the class are (a) direct inpatient payments to CHS which are set at a fixed amounts by insurance plan or otherwise regardless of the cost of the CHS

procedure; and (b) the Presiding Judge, employees of this Court, and any appellate judges exercising jurisdiction over these claims as well as employees of that appellate court.

42. Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a) The number of persons in the Class is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b) There are numerous questions of law and fact arising from the pattern of conspirators' restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendant has engaged in restraint of trade; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted on members of the Class. In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

43. The claims of the Class Representative are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representative and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

44. The Class Representative and the Representative's counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of each Class Representative and the members of the Class that would make

class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representative and the other members of the Class.

### B. Federal Rule of Civil Procedure 23(b)(3) Prerequisites

45. In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a) Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b) A class action is superior to other methods for the fair and efficient resolution of the controversy.

### C. Federal Rule of Civil Procedure 23(b)(2) Prerequisites

46. The prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## CHS'S VIOLATION OF SECTION 1 OF THE SHERMAN ACT

47. Plaintiffs incorporate paragraphs 1 through 46 of this Complaint.

48. CHS has market power in the sale of general acute care inpatient hospital services in the Charlotte area.

49. CHS has and likely will continue to negotiate and enforce contracts containing steering restrictions with insurers in the Charlotte area. The contracts containing the steering restrictions are contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

50. These steering restriction have had, and will likely to continue to have, the following substantial anticompetitive effects in the relevant product and geographic market, among others:

    (a) Depriving insurers and their enrolled inpatients of the benefits of a competitive market and competitive pricing for their purchase of acute inpatient hospital services;

    (b) Protecting CHS's market power and enabling CHS to maintain at supracompetitive levels the prices for acute inpatient hospital services;

    (c) Substantially lessening competition among providers in their sale of acute inpatient hospital services;

    (d) Restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for acute inpatient hospital services; and

    (e) Reducing consumers' incentives to seek acute inpatient hospital services from more cost-effective providers.

51. Entry or expansion by other hospitals in the Charlotte area has not counteracted the actual and likely competitive harms resulting from CHS's steering restrictions. And in the future, such entry or expansion is unlikely to be rapid enough and sufficient in scope and scale to counteract these harms to competition. Building a hospital with a strong reputation that is capable of attracting physicians and inpatients is difficult, time-consuming, and expensive. Additionally, new facilities and programs, and typically the expansion of existing facilities and programs, are subject to lengthy licensing requirements, and in North Carolina, to certificate-of-need laws.

52. CHS did not devise its strategy of using steering restrictions for any procompetitive purpose. Nor do the steering restrictions have any procompetitive effects. Any arguable benefits of CHS's steering restrictions are outweighed by their actual and likely anticompetitive effects.

53. Inpatient consumers and their insurers have paid above-competitive pricing directly to CHS materially caused by the restraint of trade.

54. The challenged steering restrictions unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and as a member of the proposed Class alleged prays that:

A. This Court declare that CHS's conduct constitutes a violation of the Sherman Act, 15 U.S.C. § 1, allowing treble damage relief to the proposed Class under Section 4 of the Clayton Act, 15 U.S.C. § 15;

B. This Court permanently enjoin Defendant from continuing the conspiracy and unlawful actions described herein under Section 16 of the Clayton Act, 15 U.S.C. § 26;

C. Plaintiff recover reasonable attorneys' fees and costs as allowed by law;

D. Plaintiff recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E. Plaintiff be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury.

February 28, 2018

Respectfully submitted,

/s/ Adam S. Hocutt
J. Gentry Caudill
N.C. Bar No. 758
Adam S. Hocutt
N.C. Bar No. 39760
DOZIER MILLER LAW GROUP
301 S. McDowell St., #700
Charlotte, NC 28204
Telephone: (704) 372-6373
Facsimile: (704) 347-0674
gcaudill@doziermillerlaw.com
ahocutt@doziermillerlaw.com

R. Stephen Berry
BERRY LAW PLLC
*(Pro Hac Vice Petition Forthcoming)*
1717 Pennsylvania Avenue, N.W.
Suite 850
Washington, D.C. 20006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
sberry@berrylawpllc.com

Steven F. Molo
*(Pro Hac Vice Petition Forthcoming*)
Justin M. Ellis
(*Pro Hac Vice Petition Forthcoming*)
Thomas J. Wiegand
(*Pro Hac Vice Petition Forthcoming*)
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161
smolo@mololamken.com
jellis@mololamken.com
twiegand@mololamken.com

*Attorneys for Plaintiffs and Proposed Class Co-Counsel*