**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
Case No. 3:18-cv-95

| | |
|---|---|
| **RAYMOND BENITEZ**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**THE CHARLOTTE MECKLENBURG HOSPITAL AUTHORITY**, d/b/a CAROLINAS HEALTHCARE SYSTEM, ATRIUM HEALTH<br><br>Defendant. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**<br>Fed. R. Civ. P. 12(c) |

## Nature of Proceeding

This lawsuit is the latest of three actions, and the second of two parasitic class actions, that have been filed against Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas HealthCare System and Atrium Health (the "Hospital Authority") alleging that so-called "steering restrictions" in contracts with commercial insurance companies have an adverse effect on competition. The first such action was filed by the United States Department of Justice and the State of North Carolina ("governments") nearly two years ago and sought injunctive relief.[1] The filing of the governments' lawsuit spurred a follow-on state class action alleging violations of North Carolina law filed on behalf of indirect purchasers—residents of North

---

[1] Complaint, *United States v. Charlotte-Mecklenburg Hospital Authority*, No. 3:16cv311 (June 19, 2016) (ECF No. 1) ("Gov't Compl.").

Carolina who paid premiums to insurance companies that had the Hospital Authority in its network.[2]

Plaintiff Raymond Benitez ("Benitez") was treated by the Hospital Authority under a policy of insurance negotiated between Blue Advantage Administrators of Arkansas, an operating division of Arkansas Blue Cross and Blue Shield and Tyson Foods (on which he is a dependent of the policy holder). He claims he ultimately paid $3,440.36 for his successful treatment in the form of a deductible and a co-payment and now brings an action on behalf of patients that made payments to the Hospital Authority, alleging that the Hospital Authority's non-discrimination provisions violate the federal antitrust laws. Plaintiff purports to represent a diverse group of patients that made "direct" payments to the Hospital Authority pursuant to a commercial insurance policy. Plaintiff copied most of his Complaint from the governments' two-year old complaint. Unlike the class plaintiffs who sought recovery of damages in state court for alleged violations of state law because they recognized they were indirect purchasers, Plaintiff here chose to seek recovery of damages in federal court for violations of federal antitrust law claiming standing as a direct purchaser. He chose poorly.

Under federal antitrust law, the Plaintiff is not entitled to damages for two reasons. ***First,*** because the Hospital Authority qualifies as a "special function governmental unit" of North Carolina, Plaintiff is barred from seeking damages under the federal antitrust laws by the Local Government Antitrust Act of 1984 ("LGAA"). 15 U.S.C. § 34 et seq. ***Second***, Plaintiff is also barred under the rule in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), that limits recovery of damages to direct purchasers only. In this matter, the pleadings establish that the Plaintiff's insurance company - - not the Plaintiff - - is the direct purchaser of services from the Hospital

---

[2] Complaint, *DiCesare v. Charlotte-Mecklenburg Hospital Authority*, No. 16CVS16404 3 (N.C. Sept. 9, 2016).

Authority. Legal precedent clearly establishes this proposition and even the allegations in the Complaint describe insurance companies, rather than patients, as the direct purchaser. Finally, the Plaintiff's claim for injunctive relief, which is essentially identical to the governments' complaint, is also flawed. Under the Fourth Circuit's principles of antitrust standing, Plaintiff's remaining claims are too remote—and Plaintiff is too poorly situated to enforce them—to justify antitrust standing.

For the foregoing reasons, the Hospital Authority respectfully requests that the Court dismiss the Complaint in its entirety with prejudice. In the alternative, if the Court finds that Plaintiff does have standing to seek injunctive relief despite the remoteness of his claims and the duplication of relief already requested in the governments' suit, the Hospital Authority requests that the court stay this proceeding pending a resolution of the governments' complaint.

### Factual Background

Plaintiff filed this lawsuit on February 28, 2018—over twenty months after the government filed the federal case (June 19, 2016) and over seventeen months after the first of the state plaintiffs filed the state case (September 16, 2016).

Plaintiff himself is mentioned only once in the Complaint. The lone paragraph in which he is mentioned is reproduced here in full:

> Plaintiff Raymond Benitez resides in Charlotte, North Carolina in Mecklenburg County. Between July 4, 2016 and July 10, 2016 he utilized CHS general acute care inpatient hospital services for seven overnight stays. He was insured by Blue Cross Blue Shield of North Carolina and under his policy made a co-insurance payment directly to CHS of $3,440.36.

Compl. ¶ 3.

In fact, Plaintiff was **not** insured by Blue Cross Blue Shield of North Carolina. As set forth in **Exhibit 1** to the Answer, Plaintiff was the dependent of a policy holder identified as

3

Estelvina Coroas under a health insurance policy issued under an agreement between Tyson Foods and Blue Advantage Administrators of Arkansas ("Blue Advantage"), an operating division of Arkansas Blue Cross and Blue Shield. The Plaintiff incurred charges for his care, received a discount through the application of the Blue Cross Blue Shield PPO Adjustment, and paid $3,440.36 in deductible and co-payment pursuant to the terms of a contract between Tyson Foods and Blue Advantage. *See* Answer Exhibit 1 (copy of the itemized statement for the Plaintiff and evidence of his insurance) (filed under Seal). Neither the existence nor the amount of the Plaintiff's deductible or copayment was determined by the Hospital Authority; nor was it negotiated by the Hospital Authority with the Plaintiff. Rather, the amount which the Plaintiff was required to pay was solely the result of the policy of insurance agreed to between Tyson Foods and Blue Advantage. *Id.*

The Hospital Authority has a separate contract with BCBSNC that was in effect at the time of the Plaintiff's treatment ("Master Agreement"). *See* Answer **Exhibit 5** (Network Participation Agreement) (filed under Seal). Under the terms of the Network Participation Agreement, the Hospital Authority must treat any person presenting a "Blue Card" as a Member. A Blue Card simply establishes evidence of coverage through an affiliated Blue Cross health plan. Pursuant to the Network Participation Agreement, Plaintiff was treated as a Member of BCBSNC, entitling access to the discounted rates negotiated by BCBSNC with the Hospital Authority. The primary policy listed on those records is BCBS OOS PPO ("Blue Cross Blue Shield Out of State Preferred Provider Organization").[3]

The Network Participation Agreement does not establish the amount of either a deductible or copayment for BCBSNC members, much less for members of out-of-state Blue

---

[3] A PPO simply designates that this is a broad network plan which has participating providers who provide healthcare at prenegotiated rates and discounts.

4

Cross Blue Shield plans like Plaintiff. *See* Answer Exhibit 5. In fact, the agreement provides in the definitions of "coinsurance" and "copayment" that these are determined by the "Benefit Plan," which is defined as the "particular set of health benefits and services provided or administered by us [BCBSNC]. . . that is issued to an individual or to a Group." *Id. at §1.3.* The Network Participation Agreement only obligates the Hospital Authority to seek the collection of any deductibles or copayments. *Id. at §4.4.* The Hospital Authority does not set a deductible, does not set a copayment, cannot raise or lower a deductible, and cannot raise or lower a copayment.

The Complaint defines the "relevant product market" as "[t]he sale of general acute care inpatient hospital services *to insurers*," Compl. ¶ 18 (emphasis supplied), and excludes services to government payors from the relevant market, Compl. ¶ 19. Proceeding from this definition of the relevant market, the Complaint focuses on the interactions between the Hospital Authority and the *insurers* with which it contracted, the alleged harm suffered by those *insurers* as a result of certain provisions in those contracts, and the trickle-down effects of that harm. The Complaint defines "prices" as "reimbursement rates" paid by *insurers* to the Hospital Authority, Compl. ¶ 11. The Complaint also acknowledges that the Hospital Authority offers "concessions … on its prices" to *insurers* who, in exchange, include the Hospital Authority as an "in-network" provider. Compl. ¶ 32.

The Complaint is little more than a patchwork of allegations lifted from the governments' complaint. It differs in only a few respects and most changes are inconsequential: there are some formalistic changes to reflect that it is Plaintiff and a putative class seeking damages and injunctive relief, rather than the governments seeking only an injunction; there are references to the governments' ongoing lawsuit at various points; and there is a new, nondescript paragraph

5

about the benefits of healthcare competition. Significantly, the Complaint omits the governments' allegation that "Charlotte area patients incur higher out of pocket costs" as a result of the alleged conduct, *compare* Gov't Compl ¶ 27 *with* Compl. ¶ 30. The Complaint does include references to "prices to insurers and inpatients," co-insurance, and a brief explanation of what co-insurance is, *see, e.g.*, Compl. ¶¶ 25, 28, 31, 34–35, 39–40. Despite these differences, however, the Complaint retains the governments' focus on the market for the sale of inpatient acute care hospital services ***to insurers***, with only cursory allegations of effects outside that alleged market.

## Standard of Review

This Court is familiar with the legal standard governing a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *See United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720 (2017) (Conrad, J.) ("*U.S. v. CMHA*"). To survive a motion for judgment on the pleadings, a plaintiff must allege "enough facts to state a claim to relief that is *plausible* on its face." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)) (emphasis in original). The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S.Ct. at 1974. In making this determination, the Court assumes the Complaint's well-pleaded facts are true and draws all reasonable inferences from pleadings in the plaintiff's favor. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

In assessing the adequacy of the Complaint in light of the pleadings, this Court must engage in a "two-pronged" approach under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). First, the Court must identify those allegations in the Complaint that are merely legal conclusions, for conclusory allegations "are not entitled to the assumption of truth." *Id.* at 664; *accord Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (the Court need not accept as true those factual

6

allegations "that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."). Second, the Court must review the remaining allegations in the light of "[judicial] experience and common sense" to determine whether the claim is actually "plausible" or instead fails to rise above the level of "possibility." *Iqbal*, 556 U.S. at 664. In making this two-pronged inquiry, the Court can consider any exhibits attached to either the Answer or the Complaint. *Eagle Nation, Inc. v. Mkt. Force, Inc.*, 180 F. Supp. 2d 752, 754 (E.D.N.C. 2001); *see Mendenhall v. Hanesbrands, Inc.*, 856 F. Supp. 2d 717, 724 (M.D.N.C. 2012) ("documents attached to the Answer are part of the pleadings for Rule 12(c) purposes … if the documents are central to the Plaintiff's claim and the authenticity is not challenged"); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (same).

Ultimately, as this Court has held, "the applicable test on a motion for judgment on the pleadings is whether, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law." *Massey v. Ojaniit*, No. 3:11-cv-477, 2013 WL 1320404, at *7 (W.D.N.C. Mar. 29, 2013) (Conrad, C.J.) (dismissing complaint based upon analysis of exhibits attached to answer under Rule 12(c)), *aff'd*, 759 F.2d 343 (4th Cir. 2014).

## Argument

### I. The LGAA Bars Recovery of Damages from the Hospital Authority

The LGAA provides absolute immunity against monetary damages for local governments. 15 U.S.C. § 35(a) ("No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act [15 U.S.C. 15, 15a, or 15c] from any local government, or official or employee thereof acting in an official capacity.") (emphasis added). Under the LGAA, the definition of "local government" includes "a school district, sanitary district, ***or any other special function governmental unit established by State law in***

7

*one or more States*[.]" 15 U.S.C. § 34(1)(B) (emphasis added). The definition of "State" means "a State, the District of Columbia, the Commonwealth of Puerto Rico, and any other territory or possession of the United States." 15 U.S.C. § 34(3) (adopting by reference the definition found in 15 U.S.C. § 15g(2)).

It is well-settled that hospitals or health systems operated as political subdivisions of the state qualify for immunity as a "special function governmental unit" under the LGAA. *Sandcrest Outpatient Services v. Cumberland County Hospital System, Inc.*, 853 F.2d 1139 (4th Cir. 1988) (affirming district court decision finding a North Carolina public hospital created under Chapter 131E immune from damages under the LGAA); *Cohn v. Wilkes General Hospital*, 767 F. Supp. 111 (W.D.N.C. 1991) ("the Fourth Circuit has recently given clear expression to the absolute immunity provided by the LGAA…" to both municipal hospitals and their employees); *Bloom v. Hennepin County*, 783 F. Supp. 418 (D. Minn. 1992) (Minnesota public hospitals are immune); *Sweeney v. Athens Regional Medical Ctr.*, 705 F. Supp. 1556, 1562 (M.D. Ga. 1989) (Georgia hospital authorities are entitled to immunity under the LGAA); *Griffith v. Health Care Auth.,* 705 F. Supp. 1489, 1501 (N.D. Ala.1989) (Alabama health care authorities entitled to absolute immunity under the LGAA); *Palm Springs Medical Clinic Inc. v. Desert Hosp.*, 628 F. Supp. 454 (C.D. Cal. 1986) (California hospital districts are local governmental entities and entitled to LGAA immunity).

The Hospital Authority qualifies for immunity under the LGAA pursuant to Fourth Circuit law. North Carolina municipal hospitals have previously been found to be exempt under the LGAA. *Sandcrest*, 853 F.2d at 1139; *Cohn*, 767 F. Supp. at 111. As with municipal hospitals, the Hospital Authority is authorized under Chapter 131E of the N.C. General Statutes, which

8

provides that the Hospital Authority is a "public body and a body corporate and politic."[4] Moreover, hospital authorities and municipal hospitals have almost identical powers and obligations, including the power to: (1) construct and maintain hospitals,[5] (2) issue bonds,[6] (3) acquire real or personal property by gift, grant, devise, lease, condemnation, or otherwise,[7] (4) establish a fee schedule,[8] (5) contract with other governmental or public agencies,[9] (6) lease any hospital facility to a nonprofit corporation[10] and (7) to exercise the power of eminent domain to acquire real property.[11]

North Carolina courts have recognized that hospital authorities are expressly created to serve a public purpose. N.C. Gen. Stat. § 131E-17(a) (hospital authority may only be created upon a finding "that it is in the interest of the public health and welfare."). See also *Knight Pub. Co. v. Charlotte-Mecklenburg Hosp. Auth.*, 172 N.C. App. 486, 486–87, 616 S.E.2d 602, 603 (2005) (citing N.C. Gen. Stat. § 131E-17(c)); *Weston v. Carolina Medicorp, Inc.*, 102 N.C. App. 370, 378, 402 S.E.2d 653, 658 (1991) (declaring the Hospital Authority (and other systems created under Chapter 131E) to be a "public body and a body corporate and politic."). As a "public body," hospital authorities are subject to state open meeting laws. *See News & Observer*

---

[4] N.C. Gen. Stat. § 131E-16(14).
[5] N.C. Gen. Stat. § 131E-7(a)(1) (municipal hospitals); N.C. Gen. Stat. § 131E-23(a)(18) (hospital authorities).
[6] N.C. Gen. Stat. § 131E-7(a)(3) (municipal hospitals); N.C. Gen. Stat. § 131E-26 (hospital authorities).
[7] N.C. Gen. Stat. § 131E-7(a)(5) (municipal hospitals); N.C. Gen. Stat. § 131E-23(a)(4), 131E-24, 131E-23(5) (hospital authorities).
[8] N.C. Gen. Stat. § 131E-7(a)(6) (municipal hospitals); N.C. Gen. Stat. § 131E-23(a)(34) (hospital authorities).
[9] N.C. Gen. Stat. § 131E-7(b) (municipal hospitals); N.C. Gen. Stat. § 131E-23(a)(22) (hospital authorities).
[10] N.C. Gen. Stat. § 131E-7(e) (municipal hospitals); N.C. Gen. Stat. § 131E-23(a)(20) (hospital authorities).
[11] N.C. Gen Stat. § 131E-10 (municipal hospitals; N.C. Gen, Stat. §§ 131E-23(a)(4) and 131E-24 (hospital authorities).

*Pub. Co. v. Wake Cty. Hosp. Sys., Inc.*, 55 N.C. App. 1, 12–13, 284 S.E.2d 542, 549 (1981) ("By virtue of the definitions in G.S. 143-318.10(b) and G.S. 159-39(a), we find that the System is a 'public body' that must, by law, record settlement terms considered in executive sessions."). Additionally, the Hospital Authority has been specifically found to be a "local unit of government" for the purposes of the North Carolina Public Records Act. *Jackson v. Charlotte Mecklenburg Hosp. Auth.*, 238 N.C. App. 351, 352, 768 S.E.2d 23, 24 (2014) ("The parties do not dispute that CHS is a local unit of government subject to the Public Records Act."). These regulations are only applicable to state agencies and local units of government.

A ruling that the Hospital Authority is entitled to immunity from damages is further supported by LGAA decisions in other states. The powers and obligations of North Carolina hospital authorities are very similar to those of hospitals in Georgia, Alabama and California where courts have found the LGAA to apply: The enabling statutes for those hospitals, like North Carolina hospital authorities, evidence the public purpose that they serve. Courts routinely point to the plain language of statutory authority articulating the critical role public hospitals play in their communities in concluding that public hospitals enjoy LGAA immunity. S*ee, e.g.*, *Sweeney*, 705 F. Supp at 1561) (Georgia hospital "operates as a not-for-profit public corporation and is 'deemed to exercise public and essential governmental functions'") (quoting the Official Code of Georgia); AL Code § 22-21-312 (2015) (hospital enabling legislation enacted "to promote the public health of the people of the state"); *Palm Springs*, 628 F. Supp at 456 n.2 (noting unrebutted argument by hospital that "its creation and regulation pursuant to California statute, Cal. Health & Safety Code §§ 23000–32492, and its performance of a public function by protecting public health and welfare through furnishing hospital services in areas with inadequate care render it a special function government unit for the purposes of [the LGAA]").

In sum, by virtue of its governmental status, the Hospital Authority is exempt from claims for damages, costs and attorneys' fees for alleged violations of the federal antitrust laws.

## II. Insured Patients Are Barred From Seeking Damages Because They Are Not Direct Purchasers

Under the Supreme Court's rule established in *Illinois Brick*, "only direct purchasers of products affected by anti-competitive activity can seek treble damages under § 4 of the Clayton Act. Those who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries." *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006); *Illinois Brick*, 431 U.S. at 730; *see also Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 217 (1990) ("In sum, even assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.").[12] The rationale for the indirect purchaser rule is that, otherwise, "courts would be required to engage in highly complicated calculations to 'apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge.'" *Kloth v. Microsoft Corp.*, 444 F.3d at 320.

While Plaintiff asserts that he has made a direct payment to the Hospital Authority, that payment in no way places him in the position of being a ***direct purchaser***. In fact, the weight of established law and the very allegations in the Complaint all point to the clear finding that Plaintiff and other insured patients are indirect purchasers. Put differently, while the Plaintiff and other insured patients may be consumers of the healthcare provided by the Hospital

---

[12] The Court in *Illinois Brick* identified three limited exceptions where indirect purchasers could sue: "(1) where a preexisting cost-plus contract controls the overcharge; (2) where the direct purchaser is owned or controlled by a member of the alleged conspiracy involved in the over-charges; and (3) where the indirect purchaser is able to prove the manufacturers and middlemen are coconspirators." ABA Section of Antitrust Law, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES, 47 (3rd Ed. 2017) (citing *Illinois Brick* 431 U.S. at 735-36). The Complaint fails to make any allegations that would support the application of any of these exceptions.

11

Authority, the prices of these services have been previously negotiated between insurers and the Hospital Authority and then repackaged into various insurance products purchased by insureds. Thus, insured patients are direct purchasers of the insurance provided to them but indirect purchasers of the healthcare that underlies those insurance products.

The law is clear that the insurance company is the direct purchaser or "immediate buyer" of health care services for purposes of assessing antitrust damages under *Illinois Brick*. *See, e.g., Kloth*, 444 F.3d at 320 ("'Indirect purchasers' are those purchasers [i]n the distribution chain, [who] are not the immediate buyers from the alleged antitrust violators.'") (quoting *UtiliCorp*, 497 U.S. at 207). Given that the rationale for *Illinois Brick* is to identify the direct victims of illegal overcharges, the determination of the "direct purchaser" requires an analysis of which entity negotiates and pays any anticompetitive overcharge. *See id.*

Courts have consistently held that, where an insurance company negotiates and pays for a service on behalf of the insured, the insurance company is the purchaser. *See, e.g. Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) (citing cases); *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922, 924–25 (1st Cir.1984) (Purchase of doctor services by Blue Shield on behalf of plan members). The decision in *Kartell* is instructive. In that case, the court analogized the relationship between Blue Shield and its members as similar to one of a father buying a toy for his son—while the son selects the toy to be purchased, it is nevertheless the father who is the purchaser. 749 F.2d 925. Extending that analogy to the case here, the father, when paying for the toy, requires his son to pay a small portion of the cost out of his allowance. The fact that the son pays a small portion of the cost does not change the father's status as the immediate buyer.

12

Plaintiff's allegations describe the relationship between insurance company and Hospital Authority in the same way. The Complaint defines the "relevant product market" as "[t]he sale of general acute care inpatient hospital services to insurers," Compl. ¶ 18, and defines "prices" as "reimbursement rates" paid by insurers to the Hospital Authority, ¶ 11. Proceeding from this definition of the relevant market, the Complaint focuses on the commercial interactions between the Hospital Authority and the insurers with which it contracted, the alleged harm suffered by those insurers as a result of certain provisions in those contracts, and the trickle-down effects of that harm. And the Complaint acknowledges that the Hospital Authority offers "concessions … on its prices" to insurers who, in exchange, steer their members toward the system. Compl. ¶ 32.

An examination of Plaintiff's claimed injury further highlights the concerns that form the basis of the Court's ruling in *Illinois Brick* prohibiting efforts to apportion the overcharge among all that may have absorbed a part of it. *Illinois Brick*, 431 U.S. at 737. Plaintiff alleges that "inpatient consumers are forced to pay above-competitive prices for co-insurance and other direct payments to CHS." Compl. ¶ 40. Even leaving aside the fact that the Complaint elsewhere defines "prices" as reimbursement rates paid by insurers to providers, *see* Compl. ¶ 11, a co-insurance payment is not a "price"; rather, it is a determination by the *insurer* as to what contribution, if any, a patient must make toward the total cost of covered health care services under the terms of the patient's benefit plan. Here, Plaintiff fails to allege that **his** co-insurance payment was supra-competitive, or that this co-insurance payment would have been lower absent the alleged anticompetitive conduct, or that he would have received the same quality of service from a lower-cost hospital but for that conduct (assuming that other hospitals in the Charlotte area even offer the types of health care services that Plaintiff received from the Hospital Authority). The Complaint likewise omits important details about the terms of Plaintiff's

13

relationship with Blue Cross that governed his co-insurance payment, such as whether Plaintiff obtained his Blue Cross health plan through an employer or elsewhere (such as the federal exchanges), which inpatient services he received from the Hospital Authority, and whether the expected co-insurance payment was expressed as a predetermined amount or a percentage of charge (and if so, what percentage).

In fact, neither the Hospital Authority nor its patients determine the method for calculating an expected co-insurance payment. The terms of health benefit plans are set by the insurers offering the plan or, in the case of a health plan offered by an employer or other group plan sponsor, through negotiation between the insurer and plan sponsor. In order to prove that the alleged conduct increased the amount of direct payments made by patients to the Hospital Authority, Plaintiff would have to trace how the Complaint's implausible allegations of increased prices to commercial insurers due to the alleged conduct translated into increased co-payments and deductibles set by the commercial insurer. This is precisely the exercise the Court in *Illinois Brick* sought to prevent with the indirect purchaser rule.

### III. Plaintiff Does Not Have Standing

For the foregoing reasons, Plaintiff is not entitled to damages and his claim devolves to one for injunctive relief on behalf of insured patients that – at least as currently drafted – is essentially identical to the governments' complaint. Given Plaintiff's remote connection to the alleged harm as an indirect purchaser and the existence of other parties (i.e., the government plaintiffs) that are better suited to bring a suit for injunctive relief, Plaintiff does not have antitrust standing.

The requirement that a plaintiff show antitrust standing "reflects a concern about whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement[.]'" *Gatt Commc'ns, Inc. v. PMC*

*Assocs., L.L.C.*, 711 F.3d 68, 80 (2d Cir. 2013) (quoting *Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 542 (1983)). To determine whether a plaintiff's pleading establishes that the plaintiff has antitrust standing, courts in this circuit consider several factors, variants of which have been termed by sister circuits as the "efficient enforcer" factors (*see Paycom*, 467 at 290): "the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended"; "'the directness of the alleged injury'"; "the existence of more direct victims' of the alleged antitrust injury"; and "'problems of identifying damages and apportioning them' among those directly and indirectly harmed[.]" *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (quoting *Associated General Contractors*, 549 U.S. at 537, 540, 545). These factors weigh heavily against a finding of antitrust standing here. The pleadings show that the causal connection between the alleged antitrust violation and the Plaintiff's claimed harm is indirect and remote, that the difficulties in identifying and apportioning the harm (if any) will be significant, and that the governments are litigating the same issue and requesting the same relief and thus (as the Complaint effectively concedes, *see* ¶¶15-17) are the more efficient enforcers.

Alternatively, given that Plaintiff is only entitled to injunctive relief and as a result seeks the same remedy on the same allegations as a preexisting action in this court, Plaintiff's claims should be dismissed or stayed pursuant to "the general principle" of avoiding "duplicative litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). District courts "have broad discretion in determining whether to stay or dismiss litigation in order to avoid duplicating a proceeding" that is already pending in federal court. *State Farm Life Ins. Co. v. Bolin*, No. 5:11-CV-1, 2011 WL 1810591, at *2–3 (W.D.N.C. May 11, 2011) (*quoting I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1551–52 (11th Cir.1986)). This

15

discretion "rests on considerations of 'wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'" *I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541, 1551 (11th Cir.1986) (*quoting Colorado River*, 424 U.S. at 817) (internal quotation marks omitted).

The relief sought in the governments' complaint would fully resolve all the matters at issue in this case. *See, e.g., Motley Rice, LLC v. Baldwin & Baldwin, LLP*, 518 F. Supp. 2d 688, 698–99 (D.S.C. 2007) (holding that the actions in two different district courts were duplicative in part because the defendants were the same). Though the plaintiffs are different, it would be overly burdensome and a waste of judicial resources for Defendant to complete discovery for the same set of facts in a different case -- particularly given that the governments have had a nearly two-year head start on this Plaintiff. *Actelion Pharm. Ltd. v. Lee*, No. 1:15-CV-1266, 2016 WL 205377, at *4–5 (E.D. Va. Jan. 13, 2016) (noting that the Defendant "would be required to potentially duplicate the significant legal work that it has already done"). This suit is superfluous: There would be no harm to Plaintiff if this action was dismissed or stayed as the relief sought is redundant of that sought in the governments' ongoing suit. *Id.*

## Conclusion

The Hospital Authority respectfully requests that the Complaint be dismissed in its entirety with prejudice, and that judgment be entered in favor of the Hospital Authority. Alternatively, the Hospital Authority respectfully requests that the Complaint be dismissed to the extent its allegations impermissibly seek damages and that this proceeding be stayed pending a resolution of the government complaint.

This 30th day of April 2018.

/s/ James P. Cooney
James P. Cooney III (N.C. Bar No. 12140)
Debbie W. Harden (N.C. Bar No. 10576)
Mark J. Horoschak (N.C. Bar No. 22816)
Brian Hayles (N.C. Bar No. 33971)
Sarah Motley Stone (N.C. Bar No. 34117)
Michael Fischer (N.C. Bar No. 47029)
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center, Suite 3500
301 South College Street
Charlotte, North Carolina 28202
Telephone: (704) 331-4900
E-mails: jim.cooney@wbd-us.com
debbie.harden@ wbd-us.com
mark.horoschak@ wbd-us.com
brian.hayles@ wbd-us.com
sarah.stone@ wbd-us.com
michael.fischer@ wbd-us.com

Hampton Y. Dellinger (N.C. Bar No. 19903)
Richard A. Feinstein*
Nicholas A. Widnell*

J. Wells Harrell*
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 237-2727
E-mails: hdellinger@bsfllp.com
rfeinstein@bsfllp.com
nwidnell@bsfllp.com
wharrell@bsfllp.com

*Attorneys for Defendant The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System*

* Pro Hac Vice Applications Forthcoming

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April, 2018, the foregoing was served via the Court's CM/ECF system to all parties registered to receive such notice including:

J. Gentry Caudill
Adam S. Hocutt
Dozier Miller Law Group
301 S. McDowell Street, Suite 700
Charlotte, NC 28204

R. Stephen Berry
Berry Law PLLC
1717 Pennsylvania Avenue, N.W.
Suite 850
Washington, DC 20006

Justin M. Ellis
Lauren M. Weinstein
Steven F. Molo
Mololamken LLP
430 Park Avenue
New York, NY 10022

Thomas J. Wiegand
Mololamken LLP
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654

*Attorneys for Plaintiff and Proposed Class Co-Counsel*

                                                /s/ James P. Cooney
                                                James P. Cooney III (N.C. Bar No. 12140)