# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

RAYMOND BENITEZ,
individually and on behalf of all others
similarly situated,

      *Plaintiff,*

   v.

THE CHARLOTTE-MECKLENBURG
HOSPITAL AUTHORITY, d/b/a
CAROLINAS HEALTHCARE SYSTEM,
ATRIUM HEALTH,

      *Defendant.*

Case No. 3:18-cv-00095-RJC-DCK

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

J. Gentry Caudill
N.C. Bar No. 758
Adam S. Hocutt
N.C. Bar No. 39760
*Attorneys for Plaintiff and*
 *Proposed Class Counsel*
DOZIER MILLER LAW GROUP
301 S. McDowell Street, # 700
Charlotte, NC 28204
Telephone: (704) 372-6373
Facsimile: (704) 347-0674
E-mail: gcaudill@doziermillerlaw.com
E-mail: ahocutt@doziermillerlaw.com

R. Stephen Berry
Admitted *Pro Hac Vice*
*Attorney for Plaintiff and*
 *Proposed Class Counsel*
BERRY LAW PLLC
1717 Pennsylvania Avenue, N.W.
Suite 850
Washington, D.C. 20006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
E-mail: sberry@berrylawpllc.com

Steven F. Molo
Admitted *Pro Hac Vice*
Thomas J. Wiegand
Admitted *Pro Hac Vice*
Lauren M. Weinstein
Admitted *Pro Hac Vice*
*Attorneys for Plaintiff and*
 *Proposed Class Counsel*
MOLOLAMKEN LLP
430 Park Avenue
New York, NY 10022
Telephone: (212) 607-8160
Facsimile: (212) 607-8161
E-mail: smolo@mololamken.com
E-mail: twiegand@mololamken.com
E-mail: lweinstein@mololamken.com

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

I.    Atrium's Evolution from a Local Hospital Authority to a Multistate
Healthcare Behemoth .......................................................................................... 2

II.    Atrium's Anti-Steering Policies ........................................................................... 3

III.   This Lawsuit .......................................................................................................... 5

STANDARD OF REVIEW ............................................................................................... 6

ARGUMENT ...................................................................................................................... 7

I.    Atrium Is Not Immune Under the Local Government Antitrust Act of 1984 ................... 7

      A.    Atrium Is Not a "Special Function Governmental Unit" Under *Tarabishi* .............8

      B.    Atrium Is Not a "Local" Government Entity .........................................................12

      C.    Atrium's Contrary Arguments Fail ......................................................................15

II.    Plaintiffs Are Direct Purchasers Under *Illinois Brick* ........................................ 18

III.   Plaintiffs Have Antitrust Standing ...................................................................... 22

IV.   There Is No Basis for Abstention Under *Colorado River* .................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 834 F. Supp. 1216 (D. Alaska 1991) ..............11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................6

*Bloom v. Hennepin County*, 783 F. Supp. 418 (D. Minn. 1992)......................................................16

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406
    (7th Cir. 1995).............................................................................................................................19

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) ...........................................................20, 22

*Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196 (7th Cir. 1985) .....................................................20

*Capital Freight Servs., Inc. v. Trailer Marine Transp. Corp.*, 704 F. Supp. 1190
    (S.D.N.Y. 1989) ...........................................................................................................................12

*Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457 (4th Cir. 2005).............................24

*Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40 (1982) ........................................................13

*Cohn v. Wilkes Gen. Hosp.*, 767 F. Supp. 111 (W.D.N.C. 1991) ..................................................16

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) .............................24

*Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127 (W.D.N.Y. 1997) ..............11, 13, 14, 17

*Griffith v. Health Care Auth. of City of Huntsville*, 705 F. Supp. 1489
    (N.D. Ala. 1989) .........................................................................................................................16

*Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977)..........................................................2, 18, 20, 21

*IT & E Overseas, Inc. v. RCA Glob. Commc'ns, Inc.*, 747 F. Supp. 6
    (D.D.C. 1990) ..............................................................................................................................14

*Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922 (1st Cir. 1984)...............................................20

*Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006)....................................................19, 21, 22

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) .............................................23

*Med. Sav. Ins. Co. v. HCA, Inc.*, No. 2:04CV156, 2005 WL 1528666
    (M.D. Fla. Jun. 24, 2005).............................................................................................................20

*N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015) .........................................13, 17

*In re Northshore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, Dkt. 989
    (N.D. Ill. Mar. 31, 2018)..................................................................................................21

*Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007) ...............................................22, 23

*Occupy Columbia v. Haley*, 738 F.3d 107 (4th Cir. 2013) .............................................................6

*Palm Springs Med. Clinic, Inc. v. Desert Hosp.*, 628 F. Supp. 454 (C.D. Cal. 1986).............13, 16

*Parker v. Brown*, 317 U.S. 341 (1943) ........................................................................................13

*Reagin v. N. Hosp. Dist. of Surry Cnty.*, No. 1:08CV250, 2009 WL 4547710
    (M.D.N.C. Nov. 25, 2009)...............................................................................................10

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) .....................................................................22, 23

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992)................................................6

*Sandcrest Outpatient Servs. v. Cumberland Cnty. Hosp. Sys.*, 853 F.2d 1139
    (4th Cir. 1988)...........................................................................................................1, 7, 15

*Sides v. Cabarrus Mem'l Hosp., Inc.*, 287 N.C. 14 (1975)...........................................................10

*Sweeney v. Athens Reg'l Med. Ctr.*, 705 F. Supp. 1556 (M.D. Ga. 1989)....................................16

*Tarabishi v. McAlester Reg'l Hosp.*, 951 F.2d 1558 (10th Cir. 1991)................................. *passim*

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*,
    No. 07CV2172, 2008 WL 11333645 (S.D. Cal. Sept. 11, 2008) ...........................................18

*United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720
    (W.D.N.C. 2017)........................................................................................................4, 6, 7, 18

*Yates v. United States*, 135 S. Ct. 1074 (2015) ...........................................................................11

*Zapata Gulf Marine Corp. v. P.R. Mar. Shipping Auth.*, 682 F. Supp. 1345
    (E.D. La. 1988) ................................................................................................................12

## STATUTES AND RULES

Clayton Antitrust Act of 1914, Pub. L. No. 63-212, 38 Stat. 730
    (codified at 15 U.S.C §§ 12-27) ....................................................................................1, 22
        15 U.S.C. § 16(a)................................................................................................5, 23, 24

Local Government Antitrust Act of 1984, Pub. L. No. 98-544, 98 Stat. 2750
    (codified at 15 U.S.C. §§ 34-36) ........................................................ *passim*
        15 U.S.C. § 34(1) .......................................................... 8, 9, 13
        15 U.S.C. § 34(1)(A) .................................................................. 11
        15 U.S.C. § 34(1)(B) .................................................................. 11
        15 U.S.C. § 35(a) ................................................................... 7, 13

N.C. Gen. Stat. § 131E-7(a)(2) ................................................................ 10

N.C. Gen. Stat. § 131E-19 ....................................................................... 10

N.C. Gen. Stat. § 131E-23 ....................................................................... 10

N.C. Gen. Stat. § 131E-24(c) ................................................................... 17

N.C. Gen. Stat. § 131E-26(a) ................................................................... 10

N.C. Gen. Stat. § 159-94(a) ..................................................................... 10

Federal Rule of Civil Procedure 12(b)(6) ................................................... 6

Federal Rule of Civil Procedure 12(c) ........................................................ 6


LEGISLATIVE MATERIALS

H.R. Rep. No. 98-965 (1984) ...................................................... 7, 9, 11, 13

S. Rep. No. 98-593 (1984) ............................................................... 7, 11


OTHER AUTHORITIES

Daniel Berger & Roger Bernstein, *An Analytical Framework for Antitrust Standing*,
    86 Yale L.J. 809, 879 (1977) ................................................................ 23

Complaint, *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*,
    No. 16 CVS 16404, Dkt. 1 (Sup. Ct. Mecklenburg Cnty. filed Sept. 9, 2016) ........... 5

Complaint, *United States v. Charlotte-Mecklenburg Hosp. Auth.*,
    No. 3:16-cv-00311, Dkt. 1 (W.D.N.C. filed June 9, 2016) ............................... 4

## INTRODUCTION

Plaintiff Raymond Benitez brought this suit on behalf of a class of inpatients who were overcharged for healthcare by defendant Charlotte-Mecklenburg Hospital Authority, now known as "Atrium Health." Atrium operates in multiple states and, in 2016 alone, earned over $6 billion in revenue from patient services and investments.

Atrium uses its dominant market share to boost its revenues. A key part of its strategy is forcing insurance companies to accept "anti-steering" restrictions: clauses in insurance contracts that prevent insurance companies from offering patients financial incentives to pursue lower cost healthcare. If insurers refused to accept Atrium's policies, they would be effectively shut out of the Charlotte market. The direct effect of those policies – as Atrium is aware – is to artificially inflate the prices of the inpatient healthcare services it provides.

Mr. Benitez seeks damages under the Clayton Act for the overpayments that he and other class members made directly to Atrium as a result of those steering restrictions. Atrium now tries to avoid having to give up its ill-gotten profits based on threshold technical arguments. But none of them has any merit.

Atrium's claim that it is immune from damages under the Local Government Antitrust Act of 1984 blinks reality. Congress passed that statute to protect local government entities such as townships and local sanitary districts. Atrium Health – a multi-billion dollar healthcare enterprise with far-flung operations across multiple states – is not a local government entity in any sense of the term. Atrium's claim that the Fourth Circuit already addressed this issue in *Sandcrest Outpatient Services v. Cumberland County Hospital System*, 853 F.2d 1139 (4th Cir. 1988), is simply false – the Fourth Circuit explicitly declined to address this question. Meanwhile, Atrium ignores appellate authority from other courts rejecting its position on identical facts.

Atrium's remaining arguments are weaker still. The claim that Mr. Benitez is an "indirect purchaser" under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), ignores the express allegations of the Complaint. Mr. Benitez is suing over artificially inflated co-insurance payments that ***he personally made directly to Atrium***. The fact that an insurance company may also have made its own separate payment to Atrium for services Mr. Benitez received does not make Mr. Benitez's payments any less direct. Atrium's antitrust injury argument likewise fails. Mr. Benitez is suing for damages because he paid a price that was artificially inflated by Atrium's anti-competitive misconduct. It is hard to imagine a more paradigmatic example of antitrust injury.

Atrium's motion should be denied in its entirety.

## BACKGROUND

I.    **Atrium's Evolution from a Local Hospital Authority to a Multistate Healthcare Behemoth**

The Charlotte-Mecklenburg Hospital Authority was originally founded in 1943 to provide hospital services to the residents of Charlotte. Atrium Health, *Carolinas HealthCare System Financial Information*, https://www.carolinashealthcare.org/about-us/corporate-financial-information ("*Financial Information*") (Ex. A). Over the six decades that followed, the Hospital Authority transformed itself from a local hospital to "the largest healthcare system in North and South Carolina" and "the second largest public health system in the United States." Dkt. 1 ("Compl.") ¶9; Dkt. 16 ("Answer") ¶9; *Financial Information* (Ex. A). It now operates in 47 different locations spread across North and South Carolina. *See* Carolinas HealthCare System, *2016 Annual Report* 3 (Ex. B). Nearly ***two-thirds*** of those locations are outside the Charlotte metropolitan area. *Id.*

To "reflect[] [its] transformation" from a local hospital to "a healthcare system with a regional footprint and national profile," the Hospital Authority changed its name in 2016 to

"Atrium Health." Carolinas HealthCare System, *Atrium Health Announced as Newest Chapter in Storied History of Carolinas HealthCare System*, PR Newswire, Feb. 7, 2018 (Ex. C). According to Atrium, it was "important to have a name that doesn't limit the organization to a specific geographic area." Rick Rothacker & John Murawksi, *Carolinas HealthCare System Takes a New Name as It Aims for Regional Growth*, Charlotte Observer, Feb. 7, 2018 (Ex. D) Continuing its expansion, Atrium recently announced plans to open in Georgia. *See* Deon Roberts & John Murawski, *Renamed Atrium Health Plans To Combine with Another Southern Hospital System*, Charlotte Observer, Feb. 8, 2018 (Ex. E).

Atrium is an extraordinarily financially successful company, operating at the upper reaches of the healthcare system. In 2016 alone, it earned nearly ***$6 billion*** in net revenue. *2016 Annual Report* 25 (Ex. B). None of those revenues came from local or other taxes. *Id.* Rather, Atrium is self-supporting, generating revenue from its healthcare services and investments and using those revenues to pay its expenses. *Id.*; *Financial Information* (Ex. A).

## II.     Atrium's Anti-Steering Policies

Far and away the largest healthcare provider in its geographic market, Atrium uses its market power to command higher prices. Compl. ¶11. Given Atrium's dominant position, insurers have no choice but to include Atrium's hospitals in their provider networks in insurance plans, along with whatever contractual terms Atrium chooses to impose. *Id.* ¶25.

This case concerns Atrium's use of anti-steering provisions to inflate the prices it charges for inpatient healthcare services. "Steering is a method by which insurers offer consumers of healthcare services options to reduce some of their healthcare expenses" by providing a "financial incentive to use a lower-cost provider or lower-cost provider network." Compl. ¶12. To maintain the high prices achieved through market dominance, Atrium "has imposed steering restrictions in its contracts with insurers" that "impede insurers from providing financial

3

incentives to patients to encourage them to consider utilizing lower-cost but comparable or higher quality alternative healthcare providers." *Id.* ¶ 14.

Those restrictions reduce competition between Atrium and other providers of inpatient hospital services in the Charlotte area that would, in the absence of the restrictions, likely reduce the prices paid for such services. Compl. ¶ 26. They also insulate Atrium from competition by limiting the ability of Atrium's competitors to win more business by offering lower prices. *Id.* Insurers tried for years to negotiate the removal of steering restrictions from their contracts with Atrium, but were unable to do so because of Atrium's market power. *Id.* ¶ 27. As a direct result of Atrium's anti-competitive steering restrictions, "inpatient consumers are forced to pay above-competitive prices for co-insurance and other direct payments to [Atrium]." *Id.* ¶ 40.

In 2016, the United States Department of Justice and the State of North Carolina sued Atrium in this district for violations of the Sherman Act resulting from its steering restrictions. *See United States v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:16-cv-00311 (W.D.N.C. filed June 9, 2016). The complaint in that case sought only injunctive relief and costs. *Id.* at Dkt. 1 ¶¶ 22-26, 40. Atrium sought to avoid even that limited relief by filing a motion for judgment on the pleadings. This Court denied the motion, ruling that the governments' complaint "sufficiently alleged facts that plausibly could support the conclusion . . . that [Atrium's] steering restraints are an unreasonable restraint on trade." *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 730 (W.D.N.C. 2017).[1]

---

[1] Another lawsuit relating to Atrium's steering restrictions is pending in Mecklenburg County Superior Court. *See DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404 (Sup. Ct. Mecklenburg Cnty. filed Sept. 9, 2016). That state action seeks damages relating to overpayments by insurance companies on behalf of insureds, not direct payments by patients themselves. *See id.* at Dkt. 1 ¶ 10.

4

### III.    This Lawsuit

The Clayton Act grants preclusive effect in private damages actions to judgments obtained by the United States Department of Justice. 15 U.S.C. § 16(a). The Act thus expressly contemplates and encourages private damages actions like this one that rely in part on government prosecutions. Public enforcement by the Department of Justice, which typically pursues only the most flagrant violations, is supplemented by private actions that seek compensation for injuries suffered and deterrence of future misconduct.

Seeking to supplement the governments' enforcement efforts here, Raymond Benitez filed this class action against Atrium on February 28, 2018. Mr. Benitez is a resident of Charlotte. Compl. ¶ 3. Between July 4 and July 10, 2016, he used Atrium inpatient hospital services for seven overnight stays. *Id.* In connection with those healthcare services, Mr. Benitez "made a co-insurance payment directly to [Atrium] of $3,440.36." *Id.*; Answer ¶ 3. That co-insurance payment was separate and distinct from any payment that Mr. Benitez's insurer may have paid to Atrium. *See* Compl. ¶ 39 ("A co-insurance payment is the percentage of the bill for inpatient medical services paid directly by the insured inpatient consumer, with the rest paid by the insurance company.").

Mr. Benitez alleges that Atrium's anti-competitive steering restrictions drove up prices for inpatient services and thus inflated the amount of co-insurance he paid. "As a result of this reduced competition due to [Atrium's] steering restrictions, inpatients . . . are denied access to consumer comparison shopping and other cost-saving innovative and more efficient health plans that would be possible if insurers could steer freely." Compl. ¶ 38. "As a direct result of [Atrium's] anti-competitive conduct, inpatient consumers are forced to pay above-competitive prices for co-insurance and other direct payments to [Atrium]." *Id.* ¶ 40.

Mr. Benitez brought this action as "a representative of persons residing in the Charlotte Combined Statistical Area making direct payments for general acute care inpatient procedures to [Atrium]." Compl. ¶41. "Such persons include inpatients making direct co-insurance payments to [Atrium] as a result of their health plan deductibles or otherwise; or, if no health insurance covers a procedure, direct payments to [Atrium] for all or part of the procedure's costs." *Id.* This action thus seeks damages for payments made directly by patients to Atrium.[2]

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is governed by the same standard as a motion to dismiss under Rule 12(b)(6). *See Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013). Both motions assess the "sufficiency of a complaint" without "resolv[ing] contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

To survive a motion for judgment on the pleadings, a complaint need only contain enough facts to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[The] judge must accept as true all of the factual allegations contained in the complaint" and "should view the complaint in the light most favorable to the plaintiff, drawing reasonable inferences in its favor." *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 725 (W.D.N.C. 2017) (quotation marks omitted). "A plaintiff's bar at the pleading stage is not a

---

[2] Atrium asserts that Mr. Benitez was not insured by Blue Cross Blue Shield of North Carolina, as alleged in the Complaint, but instead by Blue Cross Blue Shield of Arkansas, as a dependent on his mother's policy. Atrium Mem. at 3-4. That factual issue is completely irrelevant to any of the arguments Atrium makes in its motion for judgment on the pleadings. The particular Blue Cross Blue Shield entity that paid a portion of Mr. Benitez's medical bills has no bearing on the fact that **Mr. Benitez himself** made a co-insurance payment directly to Atrium that was artificially inflated by Atrium's anti-competitive conduct.

high one and . . . a complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Id.* at 732-33 (quotation marks omitted). Judgment on the pleadings is appropriate only "when the undisputed facts show that the moving party is entitled to judgment as a matter of law." *Id.* at 725.

## ARGUMENT

### I. Atrium Is Not Immune Under the Local Government Antitrust Act of 1984

Atrium claims it is immune from damages under the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C. §§ 34-36. That argument is meritless. Atrium is a multi-billion dollar healthcare enterprise with operations strewn across multiple states. It is far removed from the sorts of genuinely local government entities that Congress protected in the LGAA.

The LGAA was enacted in response to "'an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest.'" *Sandcrest Outpatient Servs. v. Cumberland Cnty. Hosp. Sys.*, 853 F.2d 1139, 1142 (4th Cir. 1988) (quoting H.R. Rep. No. 98-965, at 2 (1984)). In the two years leading up to the statute, "[m]ore than one hundred Federal antitrust suits seeking treble damages" had been filed "against cities, counties, townships, and virtually every other type of local government," challenging "[d]ozens of local government activities . . . ranging from zoning decisions to the regulation of garbage collection, airport concessions, and parking lots." S. Rep. No. 98-593, at 2 (1984). Congress wanted to "allow local governments to go about their daily functions without the paralyzing fear of antitrust lawsuits." *Id.* at 3. To that end, the statute provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act . . . from any ***local government***." 15 U.S.C. § 35(a) (emphasis added). "[L]ocal government" is defined as "(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or (B) a school district,

sanitary district, or any other special function governmental unit established by State law in one or more States." *Id.* § 34(1).

Atrium does not fit within those definitions, for two independent reasons. First, self-supporting, separately incorporated healthcare enterprises like Atrium are not "special function governmental units." The Fourth Circuit has never suggested that they are, and case law from other circuits holds the opposite. Second, even if Atrium could somehow be considered governmental, it is not a ***local*** government entity as required by the statute. Atrium is a multi-billion dollar enterprise that operates across multiple states – only a fraction of its facilities are located in the Charlotte metropolitan area. Far from protecting local government taxpayers, granting immunity to Atrium would be a windfall for a major healthcare provider that would deny its customers compensation for the serious harm it inflicted.

### A.    Atrium Is Not a "Special Function Governmental Unit" Under *Tarabishi*

Atrium claims "[i]t is well-settled that hospitals or health systems operated as political subdivisions of the state qualify for immunity as a 'special function governmental unit' under the LGAA." Atrium Mem. at 8. That is not true. In fact, courts have held just the opposite, rejecting Atrium's argument on virtually identical facts.

The Tenth Circuit confronted this precise issue in *Tarabishi v. McAlester Regional Hospital*, 951 F.2d 1558 (10th Cir. 1991). That case involved a suit against McAlester Regional Hospital, a public trust hospital in McAlester, Oklahoma. The hospital pointed to the same sorts of facts that Atrium invokes here: "The Hospital was formed as a trust for furtherance of public functions under [state law]." *Id.* at 1565 n.6. "Its trustees are public officers, appointed by the mayor of McAlester, and they must take the oath of office required of elected public officials." *Id.* "Meetings of the trustees are subject to the open meeting laws like other public boards and commissions." *Id.* And "[t]he Declaration of Trust which created the Hospital stated that the

Hospital was created for the benefit of the city of McAlester and that the purpose of the trust was to provide hospital and public health services to the residents of McAlester." *Id.*

Despite all those facts, *Tarabishi* held that the hospital was **not** a "special function governmental unit" within the meaning of the LGAA. As the court noted, nothing in the statute's text or legislative history suggests any intent to cover healthcare service providers. 951 F.2d at 1564. The examples of local government entities mentioned in the statute are all political subdivisions or other entities exercising essentially sovereign regulatory functions: "a city, county, parish, town, township, [or] village," or a "school district [or] sanitary district." 15 U.S.C. § 34(1). The examples mentioned in the legislative history are similar: "planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts." H.R. Rep. No. 98-965, at 19-20. By contrast, "[h]ospitals, whether public trust hospitals or otherwise, are not specifically mentioned." *Tarabishi*, 951 F.2d at 1564.

*Tarabishi* relied on two other key facts. ***First***, "in light of the LGAA's obvious concern to limit the imposition of treble damage awards on taxpayers," "a significant consideration is where liability for an antitrust damage award will actually fall." 951 F.2d at 1566. The City of McAlester would not be "liable for any damage award" against the hospital, and thus "the LGAA's concern about imposing unfair burdens on the taxpayers is not implicated." *Id.* ***Second***, the hospital was not immune under Oklahoma's Governmental Tort Claims Act. *Id.* "This clear exclusion suggests that the Oklahoma legislature at the time did **not** view public trust hospitals as entities comparable to municipalities, school district[s], or counties." *Id.* Based on those facts, *Tarabishi* concluded that the hospital "enjoy[ed] no immunity from damage claims under the LGAA." *Id.* at 1567.

Those exact same facts are present here as well. First, municipal taxpayers will not foot the bill for any damages award against Atrium. North Carolina law establishes hospital

authorities like Atrium as corporate entities separate from any municipal government. *See* N.C. Gen. Stat. § 131E-19 (describing "incorporation as a hospital authority"); *cf. Tarabishi*, 951 F.2d at 1565 n.6 (noting that hospital was "a separate legal entity from [the municipality]"). While North Carolina law permits Atrium to raise financing through bond offerings, state and local governments are not liable for those debts. *See* N.C. Gen. Stat. § 131E-26(a); *id.* § 159-94(a) ("Limited liability. . . . The principal of and interest on revenue bonds ***shall not be payable from the general funds of the State or the municipality*** . . . ." (emphasis added)). Atrium cannot levy taxes to support its operations – unlike certain other entities that do have such taxing power. *Compare* N.C. Gen. Stat. § 131E-23 (no taxing power for hospital authorities like Atrium), *with id.* § 131E-7(a)(2) (municipal hospitals may "levy property taxes . . . to fund hospital facilities"). Atrium is a self-supporting enterprise that pays its expenses from the fees it charges for healthcare services and the returns on its own investments, not from taxpayer funds. *See 2016 Annual Report* 25 (Ex. B); *Financial Information* (Ex. A).

Nor does North Carolina grant Atrium immunity from tort liability. Under North Carolina law, "[public] hospitals, just like any other corporate employer, are liable in tort for the[ir] negligent acts." *Sides v. Cabarrus Mem'l Hosp., Inc.*, 287 N.C. 14, 25-26 (1975). The North Carolina Supreme Court reached that conclusion because "the operation of a public hospital is not one of the 'traditional' services rendered by local governmental units," and "it is common knowledge that hospitals derive 'substantial revenues' from daily room rents, nursing care, laboratory work, etc." *Id.* at 24-25; *see also Reagin v. N. Hosp. Dist. of Surry Cnty.*, No. 1:08CV250, 2009 WL 4547710, at *2 (M.D.N.C. Nov. 25, 2009) (public hospitals not immune from tort liability because they are "engaged in a proprietary, rather than governmental, function"). Thus, just as in *Tarabishi*, it is clear that North Carolina "d[oes] ***not*** view public trust

hospitals as entities comparable to municipalities, school district[s], or counties" that share in the State's own immunity from suit. 951 F.2d at 1566.

*Tarabishi* is directly on point. There is no reason for this Court to depart from that well-reasoned decision. The court's reasoning is irrefutable: As the court noted, large healthcare enterprises like Atrium bear no resemblance to the sorts of entities that the LGAA and its legislative history mention as examples of "local government," such as a "township [or] village," 15 U.S.C. § 34(1)(A), a "sanitary district," *id.* § 34(1)(B), or a "mosquito control district[ ]," H.R. Rep. No. 98-965, at 19-20. While those examples may be illustrative rather than exhaustive, they still shed significant light on the types of entities Congress meant to cover. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) (invoking "the principle of *noscitur a sociis* – a word is known by the company it keeps – to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words'"); *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 195 (W.D.N.Y. 1997) ("[T]he statute's use of the general category 'special function governmental unit' must be understood and applied with reference to the specifically articulated examples of special function governmental units which precede it in the statute."); *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 834 F. Supp. 1216, 1228 (D. Alaska 1991) (railroad was "simply not of the type of 'special function governmental unit' that the LGAA was established to protect" because it was "hardly analogous to a water or mosquito control district").

*Tarabishi* also properly focused on Congress's overriding goal of sparing municipal taxpayers from liability. That objective is clear from the legislative history. *See, e.g.*, S. Rep. No. 98-593, at 6-7 ("[R]egardless of whether a local government has violated the antitrust laws, it is inappropriate to assess damages which ultimately must be borne by taxpayers."); H.R. Rep. No. 98-965, at 10-11 ("[P]ayment of any antitrust judgment would ultimately be drawn from the 'general revenues,' thus shifting the burden . . . to the 'innocent' taxpayers . . . ."); *id.* at 18

("[M]unicipalities – and their taxpayers who must ultimately shoulder the burden – should not be subject to punitive sanctions in the form of treble damages."). Courts thus agree that whether the economic burden of a judgment will fall on municipal taxpayers is "[p]erhaps [the] most important[ ]" consideration in determining the LGAA's scope. *See, e.g.*, *Capital Freight Servs., Inc. v. Trailer Marine Transp. Corp.*, 704 F. Supp. 1190, 1199 (S.D.N.Y. 1989) (examining whether "any antitrust damage award assessed against [a shipping authority] would be ultimately paid by the taxpayers of the Commonwealth" as "[p]erhaps [the] most important[ ] [consideration], in light of the LGAA's purpose in protecting taxpayers from being assessed with antitrust damage awards"); *Zapata Gulf Marine Corp. v. P.R. Mar. Shipping Auth.*, 682 F. Supp. 1345, 1350 (E.D. La. 1988) ("Congress prohibited the recovery of antitrust damages against local governments based on the policy that 'taxpayers should not be forced to bear the treble damage remedies recoverable from local governments . . . .'"). For similar reasons, the fact that state law denies any tort immunity to an entity speaks volumes about the State's own views about its governmental status.

In short, this case is indistinguishable from *Tarabishi*. Every factor the court of appeals relied on there is equally present here, and the court rejected all the arguments that Atrium makes now. Despite the obvious relevance of that decision, Atrium does not even cite the case, much less try to distinguish it or explain why this Court should not follow it. That case alone is fatal to Atrium's claim of immunity.

## B.     Atrium Is Not a "Local" Government Entity

Even if Atrium could somehow be deemed a governmental entity, its immunity claim would still fail for a second and independent reason. The LGAA provides immunity only to "local" government entities. And Atrium is not a local entity in any sense of the term.

The LGAA is the *Local* Government Antitrust Act. By its terms, the statute applies only to "*local* government" entities. 15 U.S.C. §§ 34(1), 35(a) (emphasis added). Consistent with that focus, the legislative history explains that the term "local government" "does not include States or their agencies with State-wide jurisdiction." H.R. Rep. No. 98-965, at 19. Rather, it covers only entities with "a geographic jurisdiction that is not co[terminous] with, and is *generally substantially smaller than*, that of the State that established it." *Id.* at 20 (emphasis added).

That limitation was no accident. At the time Congress enacted the LGAA, *state*-level entities were already entitled to claim state-action immunity in certain circumstances. *See* H.R. Rep. No. 98-965, at 19; *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 48-49 (1982); *Parker v. Brown*, 317 U.S. 341, 351 (1943). Congress passed the LGAA to create a new and different form of immunity – one that was different in scope from state-action immunity, but which applied exclusively to *local* government entities. *See Palm Springs Med. Clinic, Inc. v. Desert Hosp.*, 628 F. Supp. 454, 456-64 (C.D. Cal. 1986).[3]

Courts have thus denied LGAA immunity to entities not truly "local" in character. For example, in *Daniel v. American Board of Emergency Medicine*, 988 F. Supp. 127 (W.D.N.Y. 1997), the court denied immunity to several hospitals and medical centers with statewide operations, including the Oregon Health and Sciences University Hospital and the University of California Medical Centers. *Id.* at 194. As the court noted, Congress enacted the LGAA "to 'broaden the shield protecting *municipalities* from antitrust claims for damages.'" *Id.* The healthcare providers at issue there "[we]re not municipalities, rather, they are arms of their respective states." *Id.* "[U]nless the entity in question is charged with providing public services

---

[3] State-action immunity is subject to a number of limitations. *See, e.g.*, *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110-11 (2015) (no immunity for unsupervised delegations to active market participants). Atrium has not made any claim of state-action immunity in this case, nor has it attempted to show how it could do so in light of those limitations.

of an essentially local or regional, as opposed to state-wide, nature," application of the LGAA "would extend the exemption granted beyond the purposes of Congress." *Id.* at 195.

The court observed that "the legislative purposes of the LGAA . . . pointedly refer to the need to protect *local* taxpayers from the risk of large antitrust damage awards," a focus also apparent from "the list of other examples of such special function governmental units described in the legislative history." *Daniel*, 988 F. Supp. at 195. Expanding the statute to cover statewide entities would "blur the well-established distinctions between the state action doctrine antitrust exemption" and the LGAA. *Id.* The court's interpretation was also "consistent with the principle that *exemptions from the antitrust laws are to be narrowly construed*." *Id.* (emphasis added). The court thus concluded that the healthcare providers were "not exempt from antitrust damage awards under the LGAA." *Id.* at 195-96; *see also IT & E Overseas, Inc. v. RCA Glob. Commc'ns, Inc.*, 747 F. Supp. 6, 13 (D.D.C. 1990) (statewide telephone operator was not "a special function governmental unit, because such units have only limited geographic jurisdiction within states; the definition of 'local government' under the LGAA 'does not include . . . agencies with State-wide jurisdiction'").

Atrium is anything but a local entity. Atrium is "the largest healthcare system in North and South Carolina" and "the second largest public health system in the United States." Compl. ¶ 9; Answer ¶ 9; *Financial Information* (Ex. A). It boasts 47 different locations spread all across both North and South Carolina. *See 2016 Annual Report* 3 (Ex. B). Nearly *two-thirds* of those sites are located outside the Charlotte metropolitan area. *Id.* Moreover, Atrium earns nearly *$6 billion* in net revenue each year. *Id.* at 25. Congress cannot possibly have had sprawling healthcare enterprises like Atrium in mind when it created an immunity specifically for "local" government entities.

Indeed, outside of the context of litigation, Atrium has all but disavowed any "local" status. Atrium changed its name from the Carolinas HealthCare System to Atrium Health precisely to "reflect [its] transformation" from a local hospital to "a healthcare system with a *regional footprint and national profile*." *Atrium Health Announced as Newest Chapter* (Ex. C) (emphasis added). Atrium explained that it was "important to have a name that *doesn't limit the organization to a specific geographic area*." *Carolinas HealthCare System Takes a New Name* (Ex. D) (emphasis added). As the company itself thus recognizes, Atrium is a massive healthcare corporation with a dominant regional presence and a growing national footprint. It is the exact opposite of the "local" government entity the LGAA was enacted to protect.

### C.  Atrium's Contrary Arguments Fail

None of Atrium's responses has any merit. Atrium first asserts that "[i]t is well-settled that hospitals or health systems operated as political subdivisions of the state qualify for immunity as a 'special function governmental unit' under the LGAA." Atrium Mem. at 8. But most of the cases Atrium cites do not even address the issue, and the few that do are poorly reasoned, out-of-state district court decisions that have no persuasive value.

For example, Atrium claims that the Fourth Circuit resolved this issue in *Sandcrest Outpatient Services v. Cumberland County Hospital System*, 853 F.2d 1139 (4th Cir. 1988). But, in fact, the Fourth Circuit expressly refused to decide the issue: The appellant in that case had "not appealed the district court's determination that the Hospital System is a local government unit," and thus the court of appeals merely "*assume[d]* that the Hospital System is a government unit and address[ed], in this light, only whether . . . the *other* appellees also were entitled to immunity." *Id.* at 1142 (emphasis added); *see also Tarabishi*, 951 F.2d at 1565 (explaining that *Sandcrest* is irrelevant for that reason). It is both remarkable and telling that Atrium's lead case – and only binding authority – expressly *refused to decide* the issue Atrium attributes to it.

15

Atrium fares no better with its district court cases. Several of them do not address the issue at all. *See, e.g.*, *Cohn v. Wilkes Gen. Hosp.*, 767 F. Supp. 111, 113 (W.D.N.C. 1991) (addressing only whether private parties were acting at "direct[ion]" of hospital rather than status of hospital itself); *Bloom v. Hennepin County*, 783 F. Supp. 418, 423 (D. Minn. 1992) ("no[] dispute" over immunity issue); *cf. Palm Springs*, 628 F. Supp. at 456-57 (plaintiff did "not seriously dispute[]" immunity and addressed issue only in a footnote). The few cases that even arguably address the issue are wholly conclusory. *See Sweeney v. Athens Reg'l Med. Ctr.*, 705 F. Supp. 1556, 1561-62 (M.D. Ga. 1989) (no meaningful analysis); *Griffith v. Health Care Auth. of City of Huntsville*, 705 F. Supp. 1489, 1501 (N.D. Ala. 1989) (same). Those cases contain nothing remotely resembling the careful analysis of text and legislative history the court of appeals undertook in *Tarabishi* – among other things, they completely ignore whether municipal taxpayers would suffer the financial burden of any damages award, despite the obvious relevance of that fact under the statutory scheme. *See* pp. 11-12, *supra.* Atrium offers no reason why this Court should defer to the superficial and misguided analysis of a few out-of-state district court cases rather than the Tenth Circuit's carefully reasoned view.

Atrium points to a laundry list of powers that hospital authorities exercise under state law, including the power to "(1) construct and maintain hospitals, (2) issue bonds, (3) acquire real or personal property by gift, grant, devise, lease, condemnation, or otherwise, (4) establish a fee schedule, (5) contract with other governmental or public agencies, (6) lease any hospital facility to a nonprofit corporation and (7) to exercise the power of eminent domain to acquire real property." Atrium Mem. at 9 (footnotes omitted). But most of those powers are not "governmental" in any sense. Constructing buildings, issuing bonds, acquiring property, and

16

signing contracts are things that private corporations do every day.[4]

Atrium protests that "hospital authorities are expressly created to serve a public purpose." Atrium Mem. at 9.  But no court has ever held that the mere fact that a state-chartered entity performs socially valuable functions makes it part of the government for purposes of the LGAA. States routinely grant charters to charitable foundations and other non-profit services that perform socially valuable functions.  No one has ever thought that all such entities are immune from liability when they engage in anti-competitive conduct that harms their customers.

Finally, Atrium claims that it is subject to open meetings and public records laws. Atrium Mem. at 9-10.  But States impose disclosure requirements on publically chartered entities for all sorts of reasons; that one fact sheds no light on whether an entity is immune under the LGAA.  The court of appeals in *Tarabishi* held that the hospital in that case was not immune even though it was "subject to the open meeting laws like other public boards and commissions." 951 F.2d at 1565 n.6.  There is no reason for a different result here.

Atrium's expansive immunity arguments ignore the principle that "exemptions from the antitrust laws are to be narrowly construed."  *Daniel*, 988 F. Supp. at 195; *cf. N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015) ("[G]iven the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, state action immunity is disfavored, much as are repeals by implication." (quotation marks omitted)).

---

[4] The only even arguably governmental power on the list is eminent domain – but, on that point, Atrium misstates the law.  Hospital authorities like Atrium can **request** that property be condemned, but "[t]he right of eminent domain shall not be exercised unless and until a certificate of public convenience and necessity for the facility has been issued by the North Carolina Utilities Commission," which can "investigate and examine all facilities set up or attempted to be set up under this Part and . . . determine the question of public convenience and necessity for the facility."  N.C. Gen. Stat. § 131E-24(c).  Atrium's power of eminent domain is thus effectively only a power to **recommend** that another, truly governmental entity condemn the property.  If North Carolina actually intended to make hospital authorities governmental entities, it would have vested eminent domain power in those entities themselves.

Congress enacted the LGAA to address a specific, discrete problem involving genuinely local government entities. Atrium's efforts to expand that immunity to cover a multistate healthcare enterprise that earns $6 billion a year in revenue ignore the limits Congress imposed. There is simply no reason why Atrium, unlike thousands of other service providers, should be free to engage in anti-competitive conduct that harms its customers while refusing to pay any compensation for the injuries.

Atrium's position is all the more extraordinary given the posture of this case. This is a motion for judgment on the pleadings. Given that posture, the Court must "accept as true all of the factual allegations contained in the complaint" and "view the complaint in the light most favorable to the plaintiff, drawing reasonable inferences in its favor." *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 725 (W.D.N.C. 2017) (quotation marks omitted). There should be no doubt that Atrium is not a special function governmental unit within the meaning of the LGAA. Should any doubt occur, however, it cannot be resolved at this stage, and the case must go forward. *See, e.g.*, *United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp.*, No. 07CV2172, 2008 WL 11333645, at *4 (S.D. Cal. Sept. 11, 2008) (citing *Tarabishi*'s factual inquiry under the LGAA to conclude that court could not "determine whether [defendant] [wa]s a 'special function governmental unit' based on the pleadings"). Atrium has come nowhere close to establishing its entitlement to immunity on the pleadings.

## II. Plaintiffs Are Direct Purchasers Under *Illinois Brick*

Atrium also seeks dismissal on the ground that Mr. Benitez and the class of patients he proposes to represent are not "direct purchasers." That argument ignores the express allegations of the Complaint.

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that only "the overcharged direct purchaser, and not others in the chain of manufacture or distribution,"

may seek damages for antitrust violations. *Id.* at 729. That rule bars a claim only where plaintiffs are indirect purchasers – *i.e.*, parties "at the end of the retail distribution chain with at least one and possibly more intermediaries between them" and the defendant. *Kloth v. Microsoft Corp.*, 444 F.3d 312, 320 (4th Cir. 2006). That is not what the Complaint alleges here.

The Complaint states, and it is undisputed, that Mr. Benitez "utilized [Atrium] general acute care inpatient hospital services for seven overnight stays" and that, as payment for those services, Mr. Benitez "made **a co-insurance payment directly to [Atrium]** of $3,440.36." Compl. ¶3 (emphasis added); Answer ¶3. That co-insurance payment was a "percentage of the bill for inpatient medical services paid directly by the insured inpatient consumer" – *i.e.*, Mr. Benitez – to the hospital, and it was separate and distinct from "the rest [of the bill] paid by the insurance company." Compl. ¶39. Mr. Benitez is not seeking damages for any amounts that the insurance company paid to Atrium. Rather, he seeks damages only for the "above-competitive prices for **co-insurance and other direct payments to [Atrium]**" that Mr. Benitez and similarly situated patients paid. *Id.* ¶40 (emphasis added).

Those allegations make clear that Mr. Benitez is a direct purchaser with respect to the portion of the medical bill he paid. Mr. Benitez personally paid those funds directly to Atrium, and he personally received medical services from Atrium in return. The money went straight from Mr. Benitez to Atrium and did not pass through the hands of any insurance company or other third party along the way. This was not a situation where there were "at least one and possibly more intermediaries" between Mr. Benitez and the hospital. *Kloth*, 444 F.3d at 320. Rather, Mr. Benitez paid Atrium directly.

Courts have repeatedly held that a patient who pays a healthcare provider directly for healthcare services is a direct purchaser. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (affirming judgment in favor of insurance

19

company that paid providers while noting that, if patients were the ones who paid the fees, they would be the ones who could sue); *Med. Sav. Ins. Co. v. HCA, Inc.*, No. 2:04CV156, 2005 WL 1528666, at *8 (M.D. Fla. Jun. 24, 2005) (patients were "direct purchasers" because they paid overcharges to healthcare provider, even though insurers also paid portion of bill); *cf. Blue Shield of Va. v. McCready*, 457 U.S. 465, 474-75 (1982) (patient was direct purchaser in suit against insurer for failure to reimburse because "[patient] has paid her psychologist's bills"). That makes sense: Where a patient pays her healthcare provider directly for all or part of her medical bill, there is no conceivable sense in which that payment is anything other than a direct purchase.

Atrium offers no coherent response. It claims that "[c]ourts have consistently held that, where an insurance company negotiates and pays for a service on behalf of the insured, the insurance company is the purchaser." Atrium Mem. at 12. But the cases it cites do not even mention *Illinois Brick*. *See Brillhart v. Mut. Med. Ins., Inc.*, 768 F.2d 196, 199 (7th Cir. 1985) (holding only that an agreement between an insurance company and doctors was a vertical rather than horizontal restraint); *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 924-25 (1st Cir. 1984) (upholding ban on patient surcharges on ground that insurer was paying for services on behalf of patients). In any event, the question here is not whether the insurance company is a direct purchaser; it certainly is with respect to the portion of the bill it pays. The question is whether the fact that the insurance company and the patient split the bill somehow means that the insurance company is the ***only*** direct purchaser while the patient is merely an indirect purchaser. On that issue, tellingly, Atrium has no response at all.

Atrium reasons that where "[a] father, when paying for [a] toy, requires his son to pay a small portion of the cost out of his allowance," "[t]he fact that the son pays a small portion of the cost does not change the father's status as the immediate buyer." Atrium Mem. at 12. But that analogy only proves our point. No one in the real world would describe that transaction the way

Atrium characterizes it. If a father pays a toy store $10 directly and his son pays the toy store $1 directly, they are both direct purchasers; the son's payment is not indirect merely because he paid a smaller share. Similarly, if eight friends go out for dinner and split the check, they are all direct purchasers no matter how they divide up the bill. What matters is that each purchaser is paying the service provider directly rather than through an intermediary. *See* Order, *In re Northshore Univ. HealthSystem Antitrust Litig.*, No. 07-cv-4446, Dkt. 989, at 12 (N.D. Ill. Mar. 31, 2018) ("In healthcare-services cases, the possible candidates for the mantle of 'direct purchaser' could be the patient, the patient's employer . . . , or the insurer itself – *or possibly more than one of these candidates if more than one directly paid the healthcare provider*." (emphasis added)).

Finally, Atrium insists that patients cannot be direct purchasers because the amounts of their co-insurance payments are set by the insurance companies rather than by negotiation between the patients and the hospital. Atrium Mem. at 13-14. But the fact that insurers may play a role in setting co-insurance payments does not preclude those payments from being artificially inflated by Atrium's anti-competitive practices. That is what the Complaint alleges: Co-insurance payments are a "percentage of the bill for inpatient medical services," and "[a]s a direct result of [Atrium's] anti-competitive conduct, inpatient consumers are forced to pay above-competitive prices for co-insurance." Compl. ¶¶ 39-40. In any event, the precise mechanism by which Atrium's anti-competitive conduct inflated Mr. Benitez's co-insurance payment is beside the point. What matters under *Illinois Brick* is that Mr. Benitez paid Atrium directly for the services he purchased. *See Kloth*, 444 F.3d at 320; Compl. ¶ 3; Answer ¶ 3. How the price of the services was set has no bearing on whether Mr. Benitez's payments were direct or indirect.

## III.     Plaintiffs Have Antitrust Standing

Finally, Atrium spends two paragraphs arguing that Mr. Benitez lacks antitrust standing. Atrium Mem. at 14-15.  That argument likewise fails.

To recover damages under the Clayton Act, a plaintiff must show "antitrust standing" – *i.e.*, an injury "sufficiently connected to the violation" that forms the basis for the suit.  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007) (quotation marks omitted).  Courts consider five factors: "(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the alleged antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed."  *Id.* at 311 (quoting *Kloth*, 444 F.3d at 324).  In light of "[t]he broad language of the statute, 'and the avowed breadth of the congressional purpose,'" the Fourth Circuit has "'caution[ed] [courts] not to cabin [the statute] in ways that will defeat its broad remedial objective.'"  *Id.* at 317; *see also McCready*, 457 U.S. at 472.

Those factors favor a finding of antitrust standing here – particularly at the pleading stage.  The causal connection between the violation and the harm is clear:  Atrium used anti-competitive practices to stifle competition and thus intentionally charge supracompetitive prices to patients like Mr. Benitez.  The inflated co-insurance payments that Mr. Benitez paid were the immediate result of those supracompetitive prices.  That injury was also the type of harm Congress sought to redress in the antitrust laws:  Having to pay supracompetitive prices due to a defendant's abuse of its dominant market position is the paradigmatic example of antitrust injury.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("[A] consumer

deprived of money by reason of allegedly anticompetitive conduct is injured in 'property' within the meaning of [the Clayton Act].").

Mr. Benitez's injury is also a direct one, and there is no more direct victim with respect to the harm for which he seeks redress. That insurance companies may have been harmed with respect to the portion of the bills **they** paid is beside the point. This suit seeks redress for the artificially inflated **co-insurance payments** and other amounts that patients paid directly to Atrium. Insurance companies cannot logically recover anything for **those** injuries because they did not pay those amounts.[5] Finally, the problems of identifying and apportioning harm are no different here than in any other antitrust case. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002) (rejecting argument that "recovery of damages . . . would be too speculative and complex" because "economic experts can evaluate the impact of the defendants' illegal actions . . . and come to reasoned conclusions").

Atrium insists that Mr. Benitez lacks antitrust standing because "the governments are litigating the same issue and requesting the same relief." Atrium Mem. at 15. But the governments are suing Atrium only for injunctive relief, not damages. Their suit cannot provide compensation to the victims of Atrium's unlawful conduct. The antitrust laws expressly authorize private plaintiffs to sue for damages to supplement government enforcement efforts. *See* 15 U.S.C. § 16(a); *Reiter*, 442 U.S. at 344 ("[P]rivate suits provide a significant supplement

---

[5] Insurance companies are also poorly situated to be plaintiffs for other reasons. Insurance companies are "dependent on relationships with [the defendant] for their business livelihood" and thus lack "the incentive to pursue claims." *Novell*, 505 F.3d at 318-19; *see* Daniel Berger & Roger Bernstein, *An Analytical Framework for Antitrust Standing*, 86 Yale L.J. 809, 879 (1977) (parties "affected by an antitrust violation may well not sue because of their stake in an ongoing commercial relationship with the violator"). The fact that none of the insurance companies has sued Atrium or shown any intent to do so only confirms that fact. *See Novell*, 505 F.3d at 318-19 (fact that "none of the[] parties" allegedly more directly affected by anti-competitive conduct "has sued" suggested that Novell was "the best-situated plaintiff to assert these claims").

to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations.").  This suit thus works hand in hand with the governments' suit; it should not be dismissed in favor of that suit.

## IV.    There Is No Basis for Abstention Under *Colorado River*

Finally, Atrium asserts that this case should be dismissed or stayed in favor of the governments' action under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), to avoid "duplicative litigation."  Atrium Mem. at 15-16.  But, unlike abstention principles that rest on "weight[y] considerations of constitutional adjudication and state-federal relations," the circumstances in which a federal court can abstain based merely on the pendency of related proceedings under *Colorado River* are "considerably more limited."  424 U.S. at 818. "Only the ***clearest of justifications*** will warrant dismissal."  *Id.* at 819 (emphasis added); *see also Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005) ("[T]his form of abstention 'is an ***extraordinary and narrow exception*** to the duty of a District Court to adjudicate a controversy properly before it.' " (emphasis added)).

Atrium shows no such circumstances here.  As an initial matter, the whole premise of Atrium's request for abstention is that Mr. Benitez "is only entitled to injunctive relief."  Atrium Mem. at 15.  That premise is false:  Mr. Benitez is entitled to seek damages for all the reasons explained above.  That alone is fatal to Atrium's position.  In any event, Atrium's claims of burden and waste of resources are overblown.  Mr. Benitez is prepared to participate in discovery in the governments' case and to coordinate discovery with that case as appropriate.  Any issues resolved against Atrium in the governments' case would be granted preclusive effect in this case, further streamlining the proceedings.  15 U.S.C. § 16(a).  This case should proceed.

24

## CONCLUSION

Atrium's motion for judgment on the pleadings should be denied in its entirety. If the Court grants any portion of the motion, Mr. Benitez respectfully requests leave to replead to cure the deficiency.

Respectfully submitted this twenty-first day of May, 2018.

J. Gentry Caudill
N.C. Bar No. 758
Adam S. Hocutt
N.C. Bar No. 39760
*Attorneys for Plaintiff and*
  *Proposed Class Counsel*
DOZIER MILLER LAW GROUP
301 S. McDowell Street, # 700
Charlotte, NC  28204
Telephone: (704) 372-6373
Facsimile:  (704) 347-0674
E-mail:  gcaudill@doziermillerlaw.com
E-mail:  ahocutt@doziermillerlaw.com

R. Stephen Berry
D.C. Bar No. 234815
Admitted *Pro Hac Vice*
*Attorney for Plaintiff and*
  *Proposed Class Counsel*
BERRY LAW PLLC
1717 Pennsylvania Avenue, N.W.
Suite 850
Washington, D.C.  20006
Telephone: (202) 296-3020
Facsimile:  (202) 296-3038
E-mail:  sberry@berrylawpllc.com

   /s/ Steven F. Molo
Steven F. Molo
N.Y. Bar No. 4221743
Admitted *Pro Hac Vice*
Thomas J. Wiegand
N.Y. Bar No. 4934196
Admitted *Pro Hac Vice*
Lauren M. Weinstein
N.Y. Bar No. 5121629
Admitted *Pro Hac Vice*
*Attorneys for Plaintiff and*
  *Proposed Class Counsel*
MOLOLAMKEN LLP
430 Park Avenue
New York, NY  10022
Telephone: (212) 607-8160
Facsimile:  (212) 607-8161
E-mail:  smolo@mololamken.com
E-mail:  twiegand@mololamken.com
E-mail:  lweinstein@mololamken.com

25

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, I electronically filed the foregoing Opposition to Defendant Charlotte-Mecklenburg Hospital Authority's Motion for Judgement on the Pleadings using the CM/ECF system, which sent a notice of electronic filing to all ECF-registered participants.

        /s/ Steven F. Molo
        Steven F. Molo
        N.Y. Bar No. 4221743
        Admitted *Pro Hac Vice*
        *Attorney for Plaintiff and*
         *Proposed Class Counsel*
        MOLOLAMKEN LLP
        430 Park Avenue
        New York, NY  10022
        Telephone: (212) 607-8160
        Facsimile:  (212) 607-8161
        E-mail:  smolo@mololamken.com