UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:18-cv-00095-RJC-DCK

| | |
|---|---|
| RAYMOND BENITEZ, individually ) <br> And on behalf of all others similarly ) <br> situated ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ) <br> THE CHARLOTTE-MECKLENBURG ) <br> HOSPITAL AUTHORITY, d/b/a ) <br> Carolinas Healthcare System, d/b/a ) <br> Atrium Health ) <br> ) <br> Defendant. ) <br> _____ ) | <u>ORDER</u> |

**THIS MATTER** comes before the Court on Charlotte-Mecklenburg Hospital Authority's ("Defendant") Motion for Judgment on the Pleadings, (Doc. No. 22), and the parties' associated briefs and exhibits, (Doc. Nos. 16, 20–21, 23, 29–30, 47). Having been fully briefed, the matter is now ripe for adjudication.

I.  BACKGROUND

   A.  The Governments' Suit

   This is the second time this Court confronts this set of facts.[1] On June 19, 2016, the United States Department of Justice and the State of North Carolina

---

[1] Additionally, there is a third lawsuit currently pending in the North Carolina Business Court. <u>DiCesare v. Charlotte-Mecklenburg Hospital Authority</u>, No. 16-CVS-164043 (N.C. Sept. 9, 2016). This state class action alleges violations of North Carolina law filed on behalf of residents of North Carolina who paid premiums to insurance companies that had Defendant in its network. Plaintiffs bring two claims

1

("the Governments") filed suit against the Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas HealthCare System and Atrium Health ("Defendant" or "Atrium") seeking injunctive relief. Doc. No. 1: "Governments' Complaint," <u>United States v. Charlotte-Mecklenburg Hosp. Auth.</u>, No. 3:16-cv-311 (W.D.N.C. June 19, 2016) [hereinafter the Governments' suit]. Defendant is a North Carolina not-for-profit corporation providing healthcare services with its principal place of business in Charlotte. (<u>Id.</u> ¶ 1). Its flagship facility is Carolinas Medical Center, a large general acute-care hospital located in downtown Charlotte. (<u>Id.</u>). Defendant also operates nine other general acute-care hospitals in the Charlotte area. (<u>Id.</u>). The Governments brought a civil antitrust action to enjoin Defendant "from using unlawful contract restrictions that prohibit commercial health insurers in the Charlotte area from offering patients financial benefits to use less-expensive healthcare services offered by [Atrium's] competitors." (<u>Id.</u> at 1). The Governments contend that "[t]hese steering restrictions[2] reduce competition resulting in harm to

---

against Defendant there: (1) contract, combination, or conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1 and 75-2; and (2) monopolization in violation of Article I, Section 34 of the North Carolina Constitution and N.C. Gen. Stat. §§ 75-1.1, 75-2, and 75-2.1. Doc. No. 1: Complaint, <u>DiCesare v. Charlotte-Mecklenburg Hospital Authority</u>, No. 16-CVS-164043 (N.C. Sept. 9, 2016).
[2] "Steering is a method by which insurers offer consumers of healthcare services options to reduce some of their healthcare expenses. Steering typically occurs when an insurer offers consumers a financial incentive to use a lower-cost provider or lower-cost provider network, in order to lower their healthcare expenses." (Doc. No. 1 ¶ 12). The Governments and Plaintiff allege the following:
> To protect itself against steering that would induce price competition and potentially require [Atrium] to lower its high prices, [Atrium] has imposed steering restrictions in its contracts with insurers. These restrictions impede insurers from providing financial incentives to

2

Charlotte area consumers, employers, and insurers." (Id.). The Governments' suit remains pending in this Court.

B. The Current Suit

Between July 4 and July 10, 2016, Raymond Benitez ("Plaintiff"), a Charlotte resident, used Atrium general acute care inpatient hospital services[3] for seven overnight stays. (Doc. No. 1 ¶ 3, Benitez v. The Charlotte-Mecklenburg Hosp. Auth., 3:18-cv-95 (W.D.N.C. Feb. 28, 2018) (i.e., the instant suit)). Plaintiff sought treatment at Atrium's flagship facility. At the time services were rendered, Plaintiff was the dependent of Estelvina Coroas—a policy holder who was insured under a health insurance policy issued under an agreement between Tyson Foods (i.e., the insured's employer) and Blue Advantage Administrators of Arkansas ("Blue Advantage"), an operating division of Arkansas Blue Cross and Blue Shield. (Doc. No. 20: Ex. 1). Plaintiff incurred charges for his healthcare services. (Id.). While insurance covered most of these charges, Plaintiff paid Atrium $3,440.36 as a co-insurance payment. (Doc. No. 1 ¶¶ 3, 39) ("A co-insurance payment is the percentage of the bill for inpatient medical services paid directly by the insured inpatient consumer, with the rest paid by the insurance company.").

---

patients to encourage them to consider utilizing lower-cost but comparable or higher quality alternative healthcare providers.

(Doc. No. 1 ¶ 14); Doc. No. 1 ¶ 7, United States v. Charlotte-Mecklenburg Hosp. Auth., No. 3:16-cv-311 (W.D.N.C. June 19, 2016).

[3] "Acute inpatient hospital services consist of a broad group of medical and surgical diagnostic and treatment services that include a patient's overnight stay in the hospital." (Doc. No. 1 ¶ 20).

At the time Plaintiff received services from Atrium, Defendant had a separate contract—a Network Participation Agreement, (Doc. No. 21: Ex. 5)—with Blue Cross Blue Shield North Carolina ("BCBSNC"). The Network Participation Agreement required Atrium to treat any person presenting a "Blue Card" as a member. A Blue Card establishes evidence of coverage through an affiliated Blue Cross health plan. Under the terms of the Network Participation Agreement, Atrium treated Plaintiff as a Member of BCBSNC, which gave Plaintiff access to the discounted rates negotiated by BCBSNC with Defendant. (Doc. No. 21). The primary policy on those records is BCBS OOS PPO[4] ("Blue Cross Blue Shield Out of State Preferred Provider Organization"). (Doc. No. 20). The Network Participation Agreement authorizes Defendant to seek the collection of any deductibles or copayments, which are determined by the "Benefit Plan"—"the particular set of health benefits and services provided or administered by [BCBSNC] that is issued to an individual or to a Group." (Doc. No. 21 at 3). Defendant does not set deductible or copayment prices; rather, the insurers establish these costs.

Plaintiff's central allegation, derivative from the Governments' suit, is that Atrium's anti-competitive steering restrictions drove up prices for inpatient services and thus inflated the amount of co-insurance he paid. Plaintiff identifies the relevant product market as "[t]he sale of general acute care inpatient hospital

---

[4] A PPO designates that this is a broad network plan which has participating providers who provide healthcare at prenegotiated rates and discounts.

services to insurers ('acute inpatient hospital services')" and the relevant geographic market as "no larger than the Charlotte area." (Id. ¶ 18).

On February 28, 2018—almost two years after the Governments filed suit seeking injunctive relief against Defendant—Plaintiff commenced the instant suit against Defendant on behalf of himself and all others similarly situated. (Doc. No. 1). In this proposed class action for restraint of trade, Plaintiff seeks classwide damages and injunctive relief under Section One of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, against Defendant. (Doc. No. 1). The only difference between the requested relief in Plaintiff's suit as compared to the Governments' is that Plaintiff also seeks monetary damages for Defendant's alleged antitrust violations.

In his Complaint, Plaintiff references the Governments' preexisting case and acknowledges that he "relies, in part, on the [Governments'] thorough assessments of the [Atrium] restraint of trade and their conclusions as to what constitutes the public interest." (Id. ¶ 17). Plaintiff characterizes the instant suit as a "related action seek[ing] a remedy for consumers, who, as a result of [Atrium's] unlawful conduct, have been forced to pay [Atrium] above-competitive prices for inpatient services through co-insurance payments and other direct payments." (Id. ¶ 2). Plaintiff seeks treble damages under 15 U.S.C. § 15 as recompense for the alleged violations of the Sherman Act and injunctive relief to enjoin Defendant from continuing to use and implement anti-steering provisions in its contracts with insurers.

## II. LEGAL STANDARD

Rule 12(c) motions are governed by the same standard as motions brought under Rule 12(b)(6). Occupy Columbia v. Haley, 738 F.3d 107, 115 (4th Cir. 2013). In its review of a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs Inc. v. Matakari, 7 F.3d 1130, 1134 (4th Cir. 1993) (internal citation omitted). But the court need not accept allegations that "contradict matters properly subject to judicial notice or by exhibit." Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006) (quoting Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002)). The court may consider the complaint, answer, and any materials attached to those pleadings or motions for judgment on the pleadings "so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see also Fed R. Civ. P. 10(c) (stating that "an exhibit to a pleading is part of the pleading for all purposes."). In contrast to a Rule 12(b)(6) motion, the court may consider the answer as well on a motion brought pursuant to Rule 12(c). Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011).

The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563. A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains sufficient factual matter, accepted as true, to "state a claim to relief that is plausible

6

on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. Thus, the applicable test on a motion for judgment on the pleadings is whether, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law. Alexander, 801 F. Supp. 2d at 433.

## III. DISCUSSION

Defendant moves for judgment on the pleadings on two grounds: (1) the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C. § 34 et seq., and the "indirect purchaser" rule of Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), bar Plaintiff's claim for monetary damages[5] and (2) the doctrine of duplicative litigation and concepts of antitrust standing[6] bar Plaintiff's claim for injunctive relief. The Court addresses each argument in turn.

### A. The LGAA Bars Plaintiff's Claim for Monetary Damages.

Under the LGAA, local governments are statutorily immune from antitrust claims seeking monetary damages brought under Section 4 of the Clayton Act, 15 U.S.C. § 15, when acting in an official capacity. 15 U.S.C. § 35(a) ("No damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A,

---

[5] Because the Court finds that the LGAA bars Plaintiff's claim for monetary damages, it does not address Defendant's Illinois Brick argument.
[6] Also, because the Court finds that this suit is duplicative of the Governments' preexisting suit and thus chooses to stay the instant action until the Governments' suit is resolved, it need not reach Defendant's standing argument either.

or 4C of the Clayton Act (15 U.S.C. 15, 15a, or 15c) from any local government, or official or employee thereof acting in an official capacity."). "The Senate Report concluded that it was necessary to enact a statute that would "allow local governments to go about their daily functions without the paralyzing fear of antitrust lawsuits." Sandcrest Outpatient Servs., P.A. v. Cumberland Cty. Hosp. Sys., Inc., 853 F.2d 1139, 1142 (4th Cir. 1988) (quoting S. Rep. No. 593, 98th Cong., 2d Sess. 2 (1984)).

The LGAA specifies that the term "local government" includes "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States." Id. § 34. Courts have noted that the LGAA's language is "explicitly inclusive, not exclusive," and is to be broadly construed to apply to all aspects of local government entities' decision making. E.g., Zapata Gulf Marine Corp. v. Puerto Rico Mar. Shipping Auth., 682 F. Supp. 1345, 1351 (E.D. La. 1988). "As such, the LGAA makes no distinction between a local government's 'proprietary' and 'governmental' activities. It applies even when the local government acts as a market participant." United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., Inc., No. 07-CV-2172-AJB, 2012 WL 12845620, at *4 (S.D. Cal. Sept. 5, 2012) (quoting Palm Springs Med. Clinic, Inc. v. Desert Hospital, 628 F. Supp. 454, 457 n.2, 458 n.3 (C.D. Cal. 1986)), aff'd sub nom. United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc., 766 F.3d 1002 (9th Cir. 2014). The determination of whether something qualifies as a "special function governmental unit" turns on the state law at issue. 15 U.S.C. § 34(b) (establishing that the LGAA

8

applies to special function governmental units "established by State law"); see Tarabishi v. McAlester Regional Hosp., 951 F.2d 1558, 1566 (10th Cir. 1991) (analyzing "the question of the character of a local entity under the LGAA" in part as "a question of state law").

Here, Defendant was created under Chapter 131E of the North Carolina General Statutes (hereinafter, Chapter 131E) as a public hospital authority—"a North Carolina not-for-profit corporation providing healthcare services with its principal place of business in Charlotte." (Doc. No. 1 ¶ 4; Doc. No. 16 ¶ 4). Under the N.C. Hospital Authorities Act, § 131E, Art. 2, Pt. B, Defendant is "a public body and a body corporate and politic organized under [North Carolina law]." N.C. Gen. Stat. § 131E-16(14). North Carolina courts have explained that the designation of "body politic" under other North Carolina statutes "connote[s] a body acting as government; *i.e.* exercising powers which pertain exclusively to a government." Student Bar Ass'n Bd. of Governors, of Sch. Of Law, Univ. of N.C. Chapel Hill v. Byrd, 239 S.E.2d 415, 420 (1977). Municipal hospitals are also authorized under Chapter 131E as another form of a public hospital created by state law. N.C. Gen. Stat. § 131E, Art. 2, Pt. 1. Under Chapter 131E, municipal hospitals and hospital authorities have similar privileges, authorities, and powers—powers which are typically characterized as governmental powers.[7] Notably, Chapter 131E gives

---

[7] Compare N.C. Gen. Stat. § 131E-7, -10, -12, with § 131E-17, -23, -24, -26. Some of these powers include the power to (1) construct and maintain hospitals, (2) issue bonds, (3) acquire real or personal property, (4) establish a fee schedule for services received from hospital facilities and make the services available regardless of ability to pay, (5) contract with other governmental or public agencies, (6) lease any

9

hospital authorities the power to "act as an agent for the federal, State or local government in connection with the acquisition, construction, operation or management of a hospital facility, or any part thereof." Id. § 131E-23(a)(21). Hospitals formed under Chapter 131E are created to further public purposes. "A hospital authority may be created whenever a city council or a county board of commissioners finds and adopts a resolution finding that it is in the interest of the public health and welfare to create a hospital authority." N.C. Gen. Stat. § 131E-17(a).

Previously, the Fourth Circuit has granted absolute immunity from antitrust damages to a municipal hospital established under Chapter 131E, upholding the determination that the hospital qualified as a "special function government unit" under the LGAA. Sandcrest Outpatient Servs. v. Cumberland Cty. Hosp. Sys., Inc., 853 F.2d 1139 (4th Cir. 1988). District courts within the Fourth Circuit—including this Court—have echoed that conclusion: "the Fourth Circuit has recently given clear expression to the absolute immunity provided by the LGAA" to both county hospitals and their employees. Cohn v. Wilkes General Hosp., 767 F. Supp. 111, 112 (W.D.N.C. 1991); see also, Advance Nursing Corp. v. S.C. Hosp. Ass'n, 2016 WL 6157490, at *5 (D.S.C. 2016) (granting absolute immunity from antitrust damages under the LGAA to the government hospitals). By extension, then, Defendant—as a public hospital also formed under Chapter 131E for a public purpose to benefit the

---

hospital facility to a nonprofit corporation, and (7) to exercise the power of eminent domain to acquire real property.

health and welfare of the state—is also immune from antitrust claims seeking monetary damages. This determination is consistent with decisions from other jurisdictions considering LGAA application to other states' enabling statues for hospitals—statutes which are analogous to Chapter 131E.[8] These decisions have found it instructive that the enabling statutes specifically reference the public purpose that the hospitals are to serve and have pointed to statutory language characterizing the hospitals as a "public body corporate and politic." See, e.g.,

---

[8] The main source Plaintiff uses to assert that Defendant is not a governmental entity undermines his argument. Plaintiff stakes almost his entire argument on a Tenth Circuit case, Tarabashi v. McAlester Regional Hosp., 951 F.2d 1558 (10th Cir. 1991), interpreting an Oklahoma state law that is distinguishable from Chapter 131E. For example, the Oklahoma statute provided that a "public trust hospital" would "exist as a legal entity separate and distinct from the settlor and from the governmental entity that is its beneficiary," but did not include any provision establishing the hospital as a "public body" or "body politic." See Okla. Stat. An., tit. 60, § 176.1. The hospital in Tarabashi was created under Oklahoma law as a "public trust hospital," and the city of McAlester was its beneficiary. Tarabashi, 951 F.2d at 1566. The Tenth Circuit expressly distinguished Sandcrest—which applied LGAA immunity to a public hospital formed under Chapter 131E—Sweeney, and cases from other jurisdictions with enabling statutes similar to Chapter 131E, concluding that the public hospitals qualified as governmental units: "[n]one of these cases directly answers the question of whether a hospital operated as a public trust for furtherance of public functions with a city as its beneficiary should be considered a special function governmental unit." Id. at 1565–66. Therefore, by the Tenth Circuit's own admission, Tarabashi is not analogous to the case at hand. Rather, the Tenth Circuit found the plaintiff's argument persuasive that "Oklahoma law controls the question here, and thus the interpretation of the status of a hospital under the laws of other states is immaterial." Id. at 1564. Accordingly, the interpretation of the status of a hospital under Oklahoma law is irrelevant to the case at hand. The Tarabashi decision reinforces the Fourth Circuit's finding in Sandcrest and the Court's decision today that, under North Carolina law, the LGAA immunizes Defendant as a special function governmental unit formed under Chapter 131E.

Sweeney v. Athens Reg'l Med. Ctr., 705 F. Supp. 1556, 1561 (M.D. Ga. 1989) (applying LGAA immunity to hospital authorities in Georgia). They have also examined the powers given to hospitals under the statutes and have found LGAA immunity appropriate when those powers include the right to "exercise public and essential governmental functions." Id. As discussed *supra*, Defendant has such powers.

The determination of whether the LGAA applies is a question of law—an "objective one[ ]" that is best made during the beginning stages of a case. Sandcrest, 853 F.2d at 1148, 1148 n.9 ("[A] court should strive to resolve the immunity issue as early as possible, with a minimum of expense and time to the parties."). The Fourth Circuit reasoned that waiting to determine the applicability of LGAA immunity until after broad-ranging discovery and a trial on the merits would vitiate the underlying purpose of the LGAA. Id. at 1148 ("This would be incompatible with the underlying purpose of the LGAA, that is to protect such defendants not only from damages but also from the expense and time required to litigate such a case."). Thus, the Court finds it proper to make the LGAA-immunity determination now. According to the plain text of Chapter 131E, the statute under which Defendant was formed, as well as the functions Defendant performs and powers Defendant possesses, Defendant is a special governmental unit under the LGAA. Therefore, the LGAA shields Defendant from antitrust claims for monetary damages.

B.      Injunctive Relief

"The LGAA does not extend its immunity to injunctive relief." R. Ernest Cohn, D.C., D.A.B.C.O. v. Bond, 953 F.2d 154, 158 (4th Cir. 1991). While the LGAA immunizes Defendant from Plaintiff's claim for monetary damages, it does not bar Plaintiff's claim for injunctive relief. In addition to his claim for monetary damages, Plaintiff also seeks injunctive relief, requesting that the Court "permanently enjoin Defendant from continuing the conspiracy and unlawful actions . . . under Section 16 of the Clayton Act, 15 U.S.C. § 26." (Doc. No. 1 at 15). That is, Plaintiff requests that Defendant be enjoined from using and enforcing anti-steering provisions in its contracts with insurers. As the parties concede, Plaintiff's injunctive request is identical to the Governments' requested relief in the preexisting action currently pending in this Court. Thus, the resolution of the Governments' preexisting suit would fully resolve the matters at issue in this case.

"When two suits are pending before federal district courts, the general principle is to avoid duplicative litigation." State Farm Life Ins. Co. v. Bolin, No. 5:11-CV-1, 2011 WL 1810591, at *2 (W.D.N.C. May 11, 2011). "Trial courts are afforded broad discretion in determining whether to stay or dismiss litigation in order to avoid duplicating a proceeding already pending in another federal court." I.A. Durbin, Inc. v. Jefferson Nat. Bank, 793 F.2d 1541, 1551–52 (11th Cir. 1986). Accordingly, in order to conserve judicial resources and avoid duplicative litigation, the Court hereby stays this later-in time-proceeding pending a resolution of the government complaint.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED THAT** Defendant's Motion for Judgment on the Pleadings, (Doc. No. 22), is **GRANTED IN PART** and **STAYED IN PART**. Specifically, Plaintiff's claim for monetary damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, is **DISMISSED**. Plaintiff's claim for injunctive relief is **STAYED** pending the resolution of the Governments' preexisting suit against Defendant.

Signed: March 4, 2019

Robert J. Conrad, Jr.
United States District Judge