**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 19-2145**

_____

RAYMOND BENITEZ, individually and on behalf of all others similarly situated,

Plaintiff - Appellant,

v.

THE CHARLOTTE-MECKLENBURG HOSPITAL AUTHORITY, d/b/a Carolinas
HealthCare System, d/b/a Atrium Health,

Defendants - Appellee.

_____

_____

Appeal from the United States District Court for the Western District of North Carolina, at
Charlotte. Robert J. Conrad, Jr., District Judge. (3:18-cv-00095-RJC-DSC)

_____

Argued: January 29, 2021                    Decided: March 23, 2021

_____

Before GREGORY, Chief Judge, KEENAN, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Chief
Judge Gregory and Judge Keenan joined.

_____

**ARGUED:** Eric Franklin Citron, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland,
for Appellant. James P. Cooney, III, WOMBLE BOND DICKINSON (US) LLP,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Robert Stephen Berry, BERRY
LAW PLLC, Washington, D.C.; Tejinder Singh, GOLDSTEIN & RUSSELL, P.C.,
Bethesda, Maryland, for Appellant. Debbie W. Harden, Mark J. Horoschak, Sarah Motley
Stone, Matthew F. Tilley, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North
Carolina; Hampton Y. Dellinger, Richard A. Feinstein, Nicholas A. Widnell, BOIES

SCHILLER FLEXNER LLP, Washington, D.C., for Appellee.

2

QUATTLEBAUM, Circuit Judge:

This appeal involves the Local Government Antitrust Act of 1984, 15 U.S.C. § 34 *et seq*. Congress passed the Act "in order to broaden the scope of antitrust immunity applicable to local governments" after a surge in the filing of antitrust lawsuits threatened to "undermine a local government's ability to govern in the public interest." *Sandcrest Outpatient Servs., P.A. v. Cumberland Cnty. Hosp. Sys., Inc.*, 853 F.2d 1139, 1142 (4th Cir. 1988) (internal quotation marks omitted). Although the Act does not preclude injunctive or declaratory claims, it immunizes "local government[s]" from antitrust damages. *See* 15 U.S.C. § 35. Today, we consider whether the Charlotte-Mecklenburg Hospital Authority (the "Hospital Authority") qualifies as a "local government" under the Act.

The Act defines "local government" in two ways. First, the Act covers traditional subdivisions of a state, such as "a city, county, parish, township, village, or any other general function governmental unit established by State law . . . ." 15 U.S.C. § 34(1)(A). That provision does not apply here. Second, the Act applies to more specialized governmental entities, such as "a school district, sanitary district, or any other special function governmental unit established by State law in one or more states." *Id.* § 34(1)(B). We must decide if the Hospital Authority falls into the final category—a "special function governmental unit established by State law in one or more states." *Id.*

After the Hospital Authority moved for judgment on the pleadings, the district court concluded that it was such an entity and, therefore, dismissed the class action antitrust claims brought by Raymond Benitez against the Hospital Authority. Benitez now appeals

3

on two grounds. First, he argues that the Hospital Authority is not a "local government," and, therefore, not covered by the Act because it lacks the powers traditionally associated with "local government[s]," such as the power to tax and issue general obligation bonds. Second, he contends that, even if the Hospital Authority at one time qualified as a "special function governmental unit," it has now grown so large—by operating in three states and generating $11 billion in annual revenue—that it can no longer be considered a "*local* government."

As to Benitez's first argument, we disagree. Congress's broad definition of "local government" does not impose the requirements he advances, and we decline to rewrite the Act to include those requirements. As to Benitez's second argument, while not addressed by the district court, it also fails. Despite having some common-sense appeal, it again seeks a limitation not contained in the Act. Accordingly, we affirm.

## I.

Benitez—who had been treated at a Hospital Authority inpatient facility in 2016—filed a class action complaint against the Hospital Authority, alleging violations of Section 1 of the Sherman Act. He alleges the Hospital Authority "is the second largest public health system in the United States." J.A. 12. It is also, Benitez asserts, the largest inpatient healthcare provider in the Charlotte, North Carolina area, with approximately twelve million patient encounters every year. Because of this, it receives more than fifty percent of all inpatient revenue in the Charlotte area. According to Benitez, insurers recognize the Hospital Authority's large market share and—out of necessity—contract with the Hospital

4

Authority so that Charlotte-area residents can easily receive inpatient services. Thus, in reaching these contractual agreements, the Hospital Authority's "market power has enabled it to negotiate high prices (in the form of high 'reimbursement rates') for treating insured patients." J.A. 12. Additionally, Benitez claims the Hospital Authority "has imposed steering restrictions in its contracts with insurers." J.A. 13. He alleges these provisions are anticompetitive because they preclude "insurers from providing financial incentives to patients to encourage them to consider utilizing lower-cost but comparable or higher quality alternative healthcare providers." J.A. 13. And without such incentives, patients are effectively required to go to the Hospital Authority where the rates are higher.

Previously, the United States Department of Justice and the North Carolina Attorney General's Office filed a lawsuit in the Western District of North Carolina (the "Enforcement Action"), seeking a declaration that the steering restrictions violate Section 1 of the Sherman Act and an injunction prohibiting the Hospital Authority from seeking, agreeing to or enforcing any steering restrictions in its insurance contracts. *See* Complaint at 11–12, *United States v. Charlotte-Mecklenburg Hosp. Auth., d/b/a Carolinas Healthcare Sys.*, No. 3:16-cv-00311-RJC-DCK (W.D.N.C. June 9, 2016), ECF No. 1. After several years of litigation, the Enforcement Action was resolved by a settlement that prohibited steering restrictions. *See* Final Judgment, *United States v. Charlotte-Mecklenburg Hosp. Auth., d/b/a Carolinas Healthcare Sys.*, No. 3:16-cv-00311-RJC-DCK (W.D.N.C. April 24, 2019), ECF No. 99.

With claims that mirrored, in large part, the allegations made in the ongoing Enforcement Action, Benitez also asserted that the Hospital Authority's steering

5

restrictions violated Section 1 of the Sherman Act. On top of declaratory and injunctive relief, however, Benitez also sought monetary damages on behalf of a class of individuals residing in the Charlotte area who made direct payments for inpatient procedures to the Hospital Authority.

The Hospital Authority answered, disputing Benitez's factual allegations, defending the legality of the steering restrictions and asserting a variety of affirmative defenses, including immunity from damages, costs and attorneys' fees pursuant to the Act. Additionally, the Hospital Authority moved for judgment on the pleadings, arguing that it was immune from monetary damages because it was a "special function governmental unit"—and, therefore, a "local government"—under the Act.[1] To that end, it relied in large part on *Sandcrest*, which—according to the Hospital Authority—held that a North Carolina municipal hospital was a "local government" exempt from monetary damages under the Act.

Benitez responded first by detailing the Hospital Authority's evolution from a local hospital, "originally founded in 1943 to provide hospital services to the residents of Charlotte," to "the largest healthcare system in North and South Carolina and the second largest public health system in the United States." J.A. 80 (internal quotation marks omitted). Next, Benitez argued that the Hospital Authority is not a "special function governmental unit" under the Act because "large healthcare enterprises like [the Hospital

---

[1] The Hospital Authority also claimed that insured patients are barred from seeking damages because they are not direct purchasers and that Benitez does not have antitrust standing. Since the district court did not reach these issues, they are not before us.

Authority] bear no resemblance to the sorts of entities that the [Act] and its legislative history mention as examples of 'local government' . . . ." J.A. 89. Finally, Benitez offered an alternative argument—even if the Hospital Authority is a "special function governmental unit," it is nonetheless not a "local government" under the Act because "Congress cannot possibly have had sprawling healthcare enterprises like [the Hospital Authority] in mind when it created an immunity specifically for 'local' government entities." J.A. 92.

The district court found that the Hospital Authority is a "local government" and, therefore, immune from monetary damages. In making that finding, the district court detailed the Hospital Authority's creation and operation under North Carolina law and concluded that it had "powers which are typically characterized as governmental powers." J.A. 195. The district court also heavily relied on our *Sandcrest* decision. It noted that "[p]reviously, the Fourth Circuit has granted absolute immunity from antitrust damages to a municipal hospital established under Chapter 131E [of the North Carolina General Statutes], upholding the determination that the hospital qualified as a 'special function government[al] unit' under the [Act]." J.A. 196 (citing *Sandcrest*, 853 F.2d at 1139). The district court did not, however, address Benitez's alternative argument that the Hospital Authority's multistate operations and explosive growth precluded a finding that it was a "*local* government." The district court then stayed Benitez's claim for injunctive relief pending a resolution of the Enforcement Action. After the Enforcement Action settled, the Hospital Authority filed a renewed motion for judgment on the pleadings, which Benitez

7

did not oppose. The district court granted the motion, dismissing all claims against the Hospital Authority.

Benitez filed a timely Notice of Appeal, and we have jurisdiction over the appeal. 28 U.S.C. § 1291.

## II.

## A.

Before addressing Benitez's arguments on appeal, we begin with some history. "Congress enacted the Sherman Act in 1890." *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. This provision works in conjunction with Section 4 of the Clayton Act, which provides a private right of action for violations of the Sherman Act. *See* 15 U.S.C. § 15. As a result, any person who is "injured in his business or property" due to a violation of the Sherman Act, or other antitrust provisions, may bring a cause of action in federal court and recover treble damages. *Id.*

In 1943, the Supreme Court recognized that states, "as sovereign[s]," are immune from antitrust liability when they impose anticompetitive restraints on trade or commerce "as an act of government." *Parker v. Brown*, 317 U.S. 341, 352 (1943). In reaching this holding, the Supreme Court found "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from

8

activities directed by its legislature."[2] *Id.* at 350–51. State action immunity, however, did not extend to local governments. Instead, more than thirty years after *Parker*, a series of Supreme Court decisions opened the door to substantial municipal antitrust liability.

First, in 1978, the Court held that local governments were not automatically exempt from antitrust liability, recognizing the "serious economic dislocation which could result if cities were free to place their own parochial interests above the Nation's economic goals reflected in the antitrust laws . . . ." *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 411–13 (1978). A plurality of the Court suggested, without deciding, that local governments were exempted only when they acted "pursuant to state policy to displace competition with regulation or monopoly public service" and when the state policy was "clearly articulated and affirmatively expressed."[3] *Id.* at 410, 413. Four years later, the

---

[2] *Parker* was decided during "the most vigorous period of antitrust enforcement in American history." Michael J. Sandel, *The Constitution of the Procedural Republic: Liberal Rights and Civic Virtues*, 66 FORDHAM L. REV. 1, 9 (1997). The increase in antitrust enforcement at the tail end of the Great Depression followed President Franklin D. Roosevelt's 1938 appointment of Thurmond Arnold as head of the Antitrust Division of the Department of Justice. *See id.* But 1938 was not only a watershed year for competition in the marketplace; it was also the year of "the greatest horserace in history" when an "undersized, crooked-legged race horse" named Seabiscuit became a national hero by trouncing the legendary War Admiral. *See* Scott S. Brinkmeyer, *A Winning Combination*, 82-OCT MICH. B. J. 12, 12 & n.4 (2003). Ironically, early on, Seabiscuit seemed uninterested in racing. But during one training session, after he caught sight of another horse on the track, he took off with the ferocity and determination that propelled him to success and fame. His trainer, Tom Smith, at that moment remarked "sometimes they just hanker for a little competition." SEABISCUIT (DreamWorks Pictures 2003). Benitez apparently "hankers" for the same.

[3] The Court also suggested that the municipal action must be "actively supervised" by the state. *Id.* at 410. The Court addressed this issue in *Town of Hallie v. City of Eau Claire*, where it held that "[o]nce it is clear that state authorization exists, there is no need

Court again addressed the issue of a local government's exemption from antitrust laws in *Community Communications Co., Inc. v. City of Boulder, Colorado*, 455 U.S. 40 (1982). There, the Court held that Colorado's Home Rule Amendment, which vested local governments with the power to govern local affairs, did not constitute a clearly articulated and affirmatively expressed policy "to enact specific anticompetitive ordinances . . . ." *Id.* at 54–57.

After these decisions, antitrust litigation against local governments spiked. *See Sandcrest*, 853 F.2d at 1142 (noting the pendency of more than one hundred federal antitrust lawsuits when Congress was debating the Act). Recognizing the potential for large judgments and attorneys' fees, which would be borne by taxpayers, Congress passed the Act in order to legislatively shield local governments from antitrust damages. *See id.*; *see also Genty v. Resol. Trust Corp.*, 937 F.2d 899, 914 n.8 (3d Cir. 1991) ("In response to [*Lafayette* and *Boulder*] holding municipalities liable, Congress subsequently amended the anti-trust laws to exempt local government entities from liability for damages arising under the antitrust statute."). Thus, the Act was passed to prevent taxpayers from bearing the financial burden of their local governments' anticompetitive activity and to allow local governments to effectively govern without devoting significant time and resources to antitrust litigation. The Act does not, however, preclude lawsuits seeking injunctive relief.[4]

---

to require the State to supervise actively the municipality's execution of what is a properly delegated function." 471 U.S. 34, 47 (1985).

[4] A local government may, nonetheless, be immune from *all* liability—including injunctive relief—if it "demonstrate[s] that it is engaging in the challenged activity

10

To that end, the Act provides that "[n]o damages, interest on damages, costs, or attorney's fees may be recovered under section 4, 4A, or 4C of the Clayton Act (15 U.S.C. § 15, 15a, or 15c) from *any local government*, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35(a) (emphasis added). A "local government" is defined as follows:

(A) a city, county, parish, town, township, village, or any other general function governmental unit established by State law, or

(B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more States.

15 U.S.C. § 34(1).

B.

With that background in mind, we turn to Benitez's appeal.[5] Benitez first claims that the Hospital Authority is not a "special function governmental unit" under § 34(1)(B) because it does not share any of the hallmarks of a governmental entity and does not have

---

pursuant to a clearly expressed state policy" to displace competition. *Town of Hallie*, 471 U.S. at 40. In this instance, a local government is, in effect, afforded state action immunity.

[5] We review the district court's grant of the Hospital Authority's Rule 12(c) motion *de novo*, applying the same legal standards as the district court. *See Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014). While courts "should strive to resolve the immunity issue as early as possible, with a minimum of expense and time to the parties . . . in order to further the purpose underlying the provision of immunity," *Sandcrest*, 853 F.2d at 1148 n.9, a Rule 12(c) motion "should only be granted if, 'accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" *Priority Auto*, 757 F.3d at 139 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

11

any of the attendant powers associated with general or special purpose "local government[s]." Benitez advances four arguments in support of his contention. First, he argues that our *Sandcrest* decision did not address the issues presented here and is, therefore, not controlling. Second, he asserts that the Hospital Authority does not share the functional characteristics of the specific examples that precede "special function governmental unit" in the Act—school districts and sanitary districts—and does not exhibit the core governmental powers of "a city, county, parish, town, township, village, or . . . other general function governmental unit established by State law," such as the power to tax, issue general obligation bonds or exercise eminent domain. 15 U.S.C. § 34. Third, he argues that the Hospital Authority is not viewed by North Carolina as a traditional governmental body because it is not immune from tort liability. Finally, he contends that the Hospital Authority does not share the same relationship with North Carolina as the other entities listed in 15 U.S.C. § 34 because it is not a political subdivision of the state.

### 1.

Addressing each of Benitez's arguments in turn, we turn first to his claim that the district court erred in interpreting *Sandcrest*. The district court determined that in *Sandcrest,* we held that a North Carolina quasi-municipal hospital, established pursuant to the North Carolina Hospital Authorities Act, is a "special function governmental unit"— and thus a "local government"—under the Act. It explained "[p]reviously, the Fourth Circuit has granted absolute immunity from antitrust damages to a municipal hospital established under Chapter 131E, upholding the determination that the hospital qualified as a 'special function government unit.'" J.A. 196 (citing *Sandcrest*, 853 F.2d 1139). Benitez

12

argues that this interpretation of *Sandcrest* is incorrect. He contends that *Sandcrest* did not address, much less decide, the issues we face here. We agree. Respectfully, the district court and the Hospital Authority misread our decision in *Sandcrest*.

In *Sandcrest*, a county hospital was established under Chapter 131E of the North Carolina General Statutes. That hospital, owned and operated by the Cumberland County Hospital System, Inc., declined to renew a contract with a professional association of emergency room physicians. 853 F.2d at 1141. The physicians filed an antitrust action against the county hospital authority, its corporate manager and several individuals. *Id.* The district court granted summary judgment in favor of all defendants, finding they were entitled to immunity under the Act. *Id.*

On appeal, we noted that the physicians did not challenge the district court's determination that the county hospital authority was a "local government." *Id.* at 1142. Instead, the physicians only argued that the corporate manager and individual defendants were not entitled to immunity. *See id.* This argument implicated a different subsection of the Act, which provides that monetary damages may not be recovered "in any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a). Thus, while we assumed that the county hospital authority was a "local government" for purposes of this

13

analysis, we did so only because the physicians did not appeal the district court's finding.[6] *See Sandcrest*, 853 F.2d at 1142.

The Hospital Authority, in an attempt to buttress the district court's analysis of *Sandcrest*, argues that we could not have determined that the defendants were immune "unless [we] also concluded the county hospital system constituted a unit of local government." Br. of Appellee at 41. But that would give an assumption far more weight than it deserves. Appellate courts frequently assume unappealed findings to be true, even when the underlying premise involves a question of law. *See, e.g., Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–66 (2016) (holding that "an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case" but noting that the Supreme Court had previously "simply assumed, without deciding, that an offer of complete relief pursuant to Rule 68, even if unaccepted, moots a plaintiff's claim" when a plaintiff did not challenge the lower court's finding on that point). Doing so efficiently allows claims that are clearly presented, and perhaps dispositive, to be considered without unnecessarily deciding issues.[7] But, as we have previously held, "[w]e are bound by holdings, not unwritten

---

[6] We ultimately concluded that all defendants were entitled to immunity because their conduct was "undertaken within the scope of their authority and under adequate supervision" of the county hospital authority and the county hospital's board of trustees. *Id.* at 1146.

[7] There are many reasons assumptions arise in cases. Sometimes, like in *Sandcrest*, an issue was assumed because it was not appealed by the parties. Other times, a court assumes an issue to further an important doctrine like constitutional avoidance. *See United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (assuming a violation of the Confrontation Clause because any alleged error "was harmless beyond a reasonable doubt"). Or there can

14

assumptions." *Fernandez v. Keisler*, 502 F.3d 337, 343 n.2 (4th Cir. 2007). Accordingly, we write today on a blank slate.

2.

Benitez's remaining three arguments can be considered together. They all suggest that "special function governmental unit" as described in § 34(1)(B) applies only to governmental entities with certain powers and/or characteristics—the power of taxation, immunity from tort liability and characterization as a political subdivision—that Benitez insists the Hospital Authority lacks. To support this argument, he draws on the legislative history of the Act, which he claims reflects a desire to protect taxpayers from bearing the burden of large antitrust awards. *See, e.g.*, H.R. Rep. No. 98-965, at 11 (1984) ("[P]ayment of any antitrust judgment would ultimately be drawn from the 'general revenues,' thus shifting the burden of the punitive damage award . . . from the local officials to the 'innocent' taxpayers—a most misdirected and inequitable result."). According to Benitez, a governmental entity that would not be required to increase taxes on its citizens to satisfy an antitrust damages award, or that lacks the power to even do so, falls outside Congress' intent in passing the Act.

If we were to look solely at the Act's legislative history, this argument might be persuasive. The argument falls short, however, when we evaluate the Act's actual text. The text includes none of the limitations on a "special function governmental unit" that Benitez

---

be other reasons. The key point here is that, regardless of the reason, assumptions are not holdings. Nor are they even dicta.

15

advances. Congress could have defined "special function governmental unit" to only include those entities that have the powers and characteristics Benitez describes. But it did not do so—not originally nor in the thirty-seven years since its passage. Since Congress did not include those limitations, we decline to impose them. Our job is to interpret and apply the law, not to make it.

Benitez insists, however, that the text actually supports his arguments. He relies on the statutory interpretation principle *noscitur a sociis*—"a word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). According to Benitez, "because 'any other special function governmental unit' comes at the end of an illustrative list of examples, we should expect the 'other' units referred to here to share the most definitive elements of the illustrations (*i.e.*, 'school districts' or 'sanitary districts')." Appellant's Br. at 33. Put differently, Benitez claims that the Hospital Authority *must* share the powers and characteristics of school districts or sanitary districts in order to be a "special function governmental unit." This argument is predicated on the idea that every "school district" and "sanitary district" is a political subdivision, with the corresponding power to tax and immunity from tort liability. For two reasons, we disagree.

First, as noted above, the plain text suggests otherwise. Tools of statutory construction like the one Benitez employs can be helpful. But we must not use them in a way that contravenes plain statutory text. Indeed, the Supreme Court has held that courts should "rely on the principle of *noscitur a sociis* . . . to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'" *Yates*, 574 U.S. at 543 (quoting *Gustafson*

16

*v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). As discussed in more detail below, we do not find the district court's interpretation of "special function governmental unit" to diverge from the accompanying words in § 34(1)(B).

Second, the premise of Benitez's argument is not at all certain. Take, for example, the issue of taxation. While many school districts and sanitary districts may be fiscally independent and have the ability to raise their own revenues, some states limit the power to tax to the legislature or cities or counties. *See, e.g.*, *Marshall v. N. Va. Transp. Auth.*, 657 S.E.2d 71, 78–80 (Va. 2008) (discussing various provisions of the Virginia State Constitution that require a majority vote of the Virginia Senate and House of Delegates to impose a tax, unless a "special act for the organization, government, and powers of any county, city, town, or regional government" authorizes the power to tax).[8] This leads to a paradox that exposes the fallacies of Benitez's arguments. Benitez argues that a "special function governmental unit" must have the power to tax because the two specific entities the Act lists—school districts and sanitary districts—have that power. But in some states,

---

[8] In *Marshall*, the Supreme Court of Virginia invalidated a statute that delegated the power of taxation to the Northern Virginia Transportation Authority ("NVTA")—"a political subdivision narrowly charged by the General Assembly with the responsibility of addressing certain regional transportation issues in the Northern Virginia localities it encompasses." 657 S.E.2d at 79. Relying on several state constitutional provisions, the Court held that "NVTA is not a county, city, town, or regional government, and thus it is not a political subdivision to which the General Assembly may constitutionally delegate its legislative taxing authority . . . ." *Id.*

17

school districts and sanitary districts are prohibited from imposing taxes.[9] *See id.* Thus, the premise of Benitez's argument is flawed.

For these reasons, we are unpersuaded that either the Act's text or the statutory interpretation principle *noscitur a sociis* supports Benitez's position.

### 3.

Without the limits advanced by Benitez, we turn to the ultimate question of whether the Hospital Authority qualifies as a "special function governmental unit" under the Act. The ultimate answer is a function of federal law. But Congress' pairing of the term "special function governmental unit" with the phrase "established by State law in one or more States" requires that we also consider state law. Thus, we review the Supreme Court of North Carolina's recent decision in *DiCesare v. Charlotte-Mecklenburg Hospital Authority*, 852 S.E.2d 146 (N.C. 2020), which involved state-law unfair trade practices and antitrust claims arising out of the same type of contractual steering restrictions at issue here.

In *DiCesare*, the Supreme Court of North Carolina described the Hospital Authority's creation and operation as follows:

> The Hospital Authority was established in 1943 pursuant to the North Carolina Hospital Authorities Act, N.C.G.S. §§ 131E-15 *et seq.*, and is jointly chartered by Mecklenburg County and the City of Charlotte. The Act states that "[t]he General Assembly finds and declares that in order to protect

---

[9] According to a white paper issued by the North Carolina School Board Association, school boards in most states are considered independent units of government. But others are not; instead, they are dependent on the general government. NCSBA, FISCAL INDEPENDENCE ISSUE BRIEF, https://www.ncsba.org/wp-content/uploads/2016/08/NCSBA-Fiscal-Independence-Issue-Brief.pdf.

18

the public health, safety, and welfare, including that of low income persons, it is necessary that counties and cities be authorized to provide adequate hospital, medical, and health care and that the provision of such care is a public purpose." N.C.G.S. § 131E-1(b) (2019). The Act is intended "to provide an alternate method for counties and cities to provide hospital, medical, and health care," *id.*, and defines a hospital authority as "a public body and a body corporate and politic organized under the provisions of [the Act]." N.C.G.S. § 131E-16(14). The Hospital Authority is governed by a Board of Commissioners, whose members are appointed by the mayor or chairman of the county commission. N.C.G.S. § 131E-17(b).

The Hospital Authority provides, among other things, a suite of general acute care inpatient hospital services, including a broad range of medical and surgical diagnostic and treatment services, to individuals insured under group, fully-insured, and self-funded healthcare plans. The Hospital Authority has a large general acute-care hospital located in downtown Charlotte and nine other general acute-care hospitals in the Charlotte area. There are at least two other inpatient hospitals or multi-hospital systems operating within the Charlotte area: Novant, which operates five inpatient hospitals in the Charlotte area, and CaroMont Regional Medical Center.

*Id.* at 148–49 (footnote omitted).

The Court further characterized the Hospital Authority as a "quasi-municipal corporation," which was "created 'to serve a particular government purpose,' with the General Assembly having 'giv[en] to these specially created agencies [certain] powers and call[ed] upon them to perform such functions as the Legislature may deem best.'" *Id.* at 160–61 (alterations in original) (quoting *Greensboro-High Point Airport Auth. v. Johnson*, 36 S.E.2d 803, 809 (N.C. 1946)). Quasi-municipal corporations, such as the Hospital Authority, are commonly used in North Carolina "to perform ancillary functions in government more easily and perfectly by devoting to them, because of their character, special personnel, skill and care." *Id.* at 161 (internal quotation marks omitted). "In such instances, 'for purposes of government and for the benefit and service of the public, the

19

[S]tate delegates portions of its sovereignty, to be exercised within particular portions of its territory, or for certain well-defined public purposes.'" *Id.* (alteration in original) (quoting *Gentry v. Town of Hot Springs*, 44 S.E.2d 85, 86 (N.C. 1947)).

Against this backdrop, the Court then detailed the Hospital Authority's "particular government purpose" and the powers and functions delegated to it by the North Carolina General Assembly. *See id.* at 160–61 (internal quotation marks omitted).

> [T]he Hospital Authority was created in accordance with N.C.G.S. § 131E-17(a) when the Charlotte city council adopted a resolution in which it "[found] that the public health and welfare, including the health and welfare of persons of low income in the City and said surrounding area, require the construction, maintenance, or operation of public hospital facilities for the inhabitants thereof." At that point, the mayor of Charlotte appointed eighteen individuals to serve as commissioners of the Hospital Authority pursuant to N.C.G.S. §§ 131E-17(b), -18, with the mayor having maintained the authority to remove commissioners "for inefficiency, neglect of duty, or misconduct in office" in accordance with N.C.G.S. § 131E-22. The Hospital Authority possesses the authority to acquire real property by eminent domain pursuant to N.C.G.S. § 131E-24 and to issue revenue bonds under the Local Government Revenue Bond Act pursuant to N.C.G.S. § 131E-26. The Hospital Authority is subject to annual audits by the mayor or the chairman of the county commission pursuant to N.C.G.S. § 131E-29; to the Public Records Law, and to regulation by the Local Government Commission. In sum, the Hospital Authority was clearly created by the City of Charlotte, pursuant to statute, to provide public healthcare facilities for the benefit of the municipality's inhabitants.

*Id.* at 161 (citations omitted).

*DiCesare*'s thorough analysis provides a helpful foundation for evaluating whether the Hospital Authority is a "special function governmental unit established by State law in one or more States." *See* 15 U.S.C. § 34(1)(B). Undoubtedly, the Hospital Authority was "established by" North Carolina law. *See DiCesare*, 852 S.E.2d at 148–49 ("The Hospital Authority was established in 1943 pursuant to the North Carolina Hospital Authorities Act,

20

N.C.G.S. §§ 131E-15 *et seq*., and is jointly chartered by Mecklenburg County and the City of Charlotte." (footnote omitted)). The legislative purpose of the Hospital Authorities Act is express: "The General Assembly finds and declares that in order to protect the public health, safety, and welfare, including that of low income persons, it is necessary that counties and cities be authorized to provide adequate hospital, medical, and health care and that the provision of such care is a *public purpose*." N.C.G.S. § 131E-15(b) (emphasis added). The Hospital Authorities Act specifically defines a "hospital authority" as "a public body and a body corporate and politic organized under the provisions of this [Act]." *Id.* § 131E-16(14). As the Supreme Court of North Carolina held in *DiCesare*, "[a]lthough quasi-municipal corporations are not subject to all of the requirements applicable to other governmental entities, it is clear that their essential function is, at its core, the governmental provision of services." 852 S.E.2d at 162.

Further, as the district court noted, the Hospital Authority has many "powers which are typically characterized as governmental powers," including the power to:

> (1) construct and maintain hospitals, (2) issue bonds, (3) acquire real or personal property, (4) establish a fee schedule for services received from hospital facilities and make the services available regardless of ability to pay, (5) contract with other governmental or public agencies, (6) lease any hospital facility to a nonprofit corporation, and (7) to exercise the power of eminent domain to acquire real property.

J.A. 195–96 n.7. To be sure, private hospitals also share several of these powers, but the authority to acquire real property by eminent domain and the "power to issue revenue bonds under the Local Government Revenue Bond Act . . . for the purpose of acquiring,

21

constructing, . . . or operating hospital facilities" are uniquely governmental powers. *Id.* §§ 131E-24, 26.

There is no magic combination of powers that a governmental body must have to be classified as a "special function governmental unit." However, those of the Hospital Authority, as outlined by the Supreme Court of North Carolina, readily qualify.

4.

We recognize that the Tenth Circuit, in *Tarabishi v. McAlester Regional Hospital*, 951 F.2d 1558 (10th Cir. 1991), reached a different conclusion in finding an Oklahoma public trust hospital was not a "special function governmental unit." In reaching this conclusion, the Tenth Circuit was guided by two considerations: (1) that citizens of the Oklahoma city were beneficiaries of the public trust and would not be liable for any antitrust damages award; and (2) state law "viewed public trust hospitals as entities different from political subdivisions." *Id.* at 1566.

At first blush, *Tarabishi* is seemingly at odds with our holding. After all, it, like Benitez, places significant emphasis on the Act's legislative history. *See id.* at 1564. There, the hospital "was formed as a trust for furtherance of public functions under [Oklahoma state law]." *Id.* at 1565 n.6. In contrast, the Hospital Authority is "a public body and a body corporate and politic organized under the provisions of [the North Carolina Hospital Authorities Act]." *Id.* § 131E-16(14). Importantly, however, *Tarabishi* recognized that how an entity is classified under state law is critical and cited to a variety of cases where hospitals were held to be "local governments." *See Tarabishi*, 951 F.2d at 1565–66 (collecting cases). The Tenth Circuit did not question the validity of these cases and,

22

instead, emphasized that the structure of a public trust hospital was unique and distinguishable. *See id*. at 1566 ("None of these cases directly answers the question of whether a hospital operated as a public trust for furtherance of public functions with a city as its beneficiary should be considered a special function governmental unit.").

Indeed, we note that the Hospital Authority is far more similar to the hospital in *Sweeney v. Athens Regional Medical Center*, which was distinguished by *Tarabishi*, than to the public trust hospital in *Tarabishi*. *See Sweeney*, 705 F. Supp. 1556, 1561–62 (M.D. Ga. 1989) (holding that Athens Regional Medical Center, "a public hospital authority organized under the Georgia Hospital Authorities Law," is a "local governmental unit for purposes of the Act" because it is "deemed to exercise public and essential governmental functions and shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of [the Hospital Authorities Law]" (quoting Ga. Code Ann. §§ 31-7-75, 77 (1985))). Thus, while we reach a different result than *Tarabishi*, our holding is not inconsistent with its reasoning.

In sum, we conclude that the Hospital Authority is a "special function governmental unit" under the Act.

### C.

Having rejected Benitez's primary argument, we now turn to his alternative position. Benitez has consistently argued that even if the Hospital Authority *was* a "local government" when it was established, it has outgrown its immunity. Specifically, in response to the Hospital Authority's motion for judgment on the pleadings, Benitez claimed that the Hospital Authority "now operates in 47 different locations spread across

23

North and South Carolina," with nearly two-thirds of those locations being located "outside the Charlotte metropolitan area," and "recently announced plans to open in Georgia." J.A. 80–81. Because of this rapid expansion, Benitez argued that the Hospital Authority "is not a local entity in any sense of the term." J.A. 90. Benitez insists this argument is supported by the Act's text because the Act "is the *Local* Government Antitrust Act, and by its terms applies only to '*local* government' entities." Appellant's Br. at 59.

The Hospital Authority offers several responses. First, it argues the text does not support Benitez's position. According to the Hospital Authority, if Congress intended to impose the limitation Benitez advances, it could easily have done so. But it did not. Instead, Congress defined "local government" to include "a school district, sanitary district, or any other special function governmental unit established by State law in one or more States." 15 U.S.C. § 34(1)(B). That means, according to the Hospital Authority, any boundaries, geographic or otherwise, depend on North Carolina law.

Next, the Hospital Authority contends that the Act's "established by State law in one or more States" language contemplates a "local government" that operates in more than one state. In fact, the Hospital Authority points to entities that operate in many states that have been held immune as a "local government" under the Act. *See, e.g., Cap. Freight Servs., Inc. v. Trailer Marine Transp. Corp.*, 704 F. Supp. 1190, 1199–1200 (S.D.N.Y. 1988) (finding that a Puerto Rican international shipping authority was a "local government" entitled to immunity under the Act and noting "there is no requirement that the governmental instrumentality have a geographically defined jurisdiction").

24

After carefully considering the parties' arguments, we acknowledge that Benitez's argument has some initial appeal. It does seem unusual for an organization of the geographic and financial scope of the Hospital Authority to qualify as a "local government." The problem with this argument, however, is that the language of the Act does not support it. The text asks only whether an organization qualifies as a "local government," as defined by the Act. And that determination requires examining the state law applicable to the entity's creation. *See* 15 U.S.C. § 34(1)(B) (defining "local government" to include various entities "established by State law in one or more States"). As with Benitez's other argument, he asks us to re-write the Act to impose a limitation it does not currently contain.

And even if we were to adopt Benitez's position, how would we determine the boundaries of a "local government"? If an organization was able to simply outgrow the Act's protection, what would be the lines that would disqualify it? Would they be financially based? That would be difficult given that the revenues of some cities, which are clearly "local government[s]" under the Act, dwarf those of the Hospital Authority.[10] Or would the limitations be geographic? If so, would an entity cease to be "local" if it grew beyond the city or county that created it, even if allowed by state law? Would any growth beyond those borders be disqualifying? Or would it require going into another state? In other words, how much growth is too much?

---

[10] For example, New York City's budget in 2017 was approximately $85 billion. *Understanding New York City's Budget A Guide*, New York City Independent Budget Office at 2, https://www.ibo.nyc.ny.us/iboreports/understandingthebudget.pdf.

25

The answers to these questions involve complex policy considerations. Navigating these considerations is the work of lawmakers, not judges. It may make eminent sense to amend the Act to impose some sort of limitation beyond which an entity could no longer qualify as a "local government." But if that is to be done, it should be done by Congress, not us. Thus, we reject Benitez's argument that the Hospital Authority has outgrown its status as a "local government."

But our decision is limited to Benitez's argument. Benitez does not allege, for example, that the Hospital Authority is operating outside the purview of a its statutory authority under North Carolina law or even that it committed anticompetitive acts outside of the local area where it was created. Indeed, as the Hospital Authority pointed out at oral argument, both Benitez's treatment and the alleged anti-competitive activity took place in the Charlotte area. Because of that, Benitez's allegations involve only "local" conduct.

There may be circumstances where a "special function governmental unit" does not enjoy the Act's immunity. For example, if Benitez alleged that the Hospital Authority was operating in contravention of North Carolina law or if the Hospital Authority was sued in Georgia involving alleged anticompetitive conduct in a Georgia geographic market, we might reach a different conclusion. But since those issues are not presented to us, we express no view on them and leave them for another day.

26

III.

For the reasons stated above, we agree with the district court that the Hospital Authority is a "special function governmental unit" and, therefore, a "local government" under the Act. Accordingly, the district court's order is

*AFFIRMED.*

27